IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES E. COOKE, JR., | § | |
| | § | No. 12, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 0506005981 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: September 18, 2024
Decided: January 2, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LeGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Christopher S. Koyste, Esquire, LAW OFFICE OF CHRISTOPHER S. KOYSTE, LLC, Wilmington, Delaware; James T. Lawley, Esquire, (*argued*), Beth Ann Muhlhauser, Esquire, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Harrisburg, Pennsylvania, *for Appellant James E. Cooke, Jr.*

Carolyn S. Hake, Esquire, (*argued*); Kathryn J. Garrison, Esquire, (*argued*) DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

James E. Cooke, Jr., has been twice convicted and twice sentenced for the 2005 rape and murder of Lindsey Bonistall, a 20-year-old student at the University of Delaware in Newark. This Court based the reversal of Cooke's first conviction in 2009 on, among other things, his defense counsel's pursuit of a trial strategy—asking the jury to return a verdict of guilty but mentally ill—that effectively negated Cooke's not guilty plea and his objective of gaining an acquittal. The explicit premise of our ruling was that "Cooke was competent to stand trial and chose the alternative of a plea of not guilty over a plea of guilty but mentally ill."[1] It was therefore improper and, more than that, a violation of Cooke's fundamental constitutional rights for Cooke's lawyers to unilaterally pursue a strategy at trial that was diametrically opposed to Cooke's objectives.

Having secured a reversal of his convictions, Cooke stood trial again in 2012. Along the way, Cooke steadfastly resisted his new lawyers' efforts to develop a defense grounded in what appeared to them to be Cooke's serious mental health issues. Cooke even went so far as to ask the Superior Court to allow him to represent himself in the second trial. And in the event, after an extensive colloquy with Cooke that tested the reliability of his waiver of his right to counsel and his ability to represent himself, the court granted Cooke's request, and the second trial began with

---

[1] *Cooke v. State*, 977 A.2d 803, 842 (Del. 2009).

Cooke at the helm. Because of Cooke's disruptive courtroom conduct, the trial court withdrew its permission not long after the second trial began and reinstated Cooke's lawyers, who had been observing the trial as standby counsel. Cooke was once again convicted and sentenced, and he appealed. This time around, this Court affirmed his convictions.

In March 2015, Cooke filed a five-page motion for postconviction relief under Superior Court Criminal Rule 61, which offers an avenue for convicted criminal defendants to seek relief from their convictions "on the ground that the court lacked jurisdiction or any other ground that is a sufficient factual and legal basis for collateral attack upon a criminal conviction . . . ."[2] In his motion, Cooke alleged that his trial counsel rendered such ineffective assistance that he was effectively deprived of his right to counsel under the United States and Delaware constitutions. In particular, Cooke alleged that his lawyers "failed to adequately investigate, to seek to exclude, and to adequately impeach state witnesses about the state's evidence, including but not limited to: the DNA analysis; the handwriting identifications; the voice identifications; and the visual identifications."[3] Cooke also alleged that his trial counsel were constitutionally ineffective in their preparation for and presentation at the penalty phase of his trial and that his convictions under two

---

[2] Super. Ct. Crim. R. 61(a)(1).
[3] App. to Opening Br. at A651.

3

separate counts of first-degree murder violated state and federal guarantees against double jeopardy. It was understood at the time that, with the Superior Court's permission, Cooke's motion was, in the court's words, "a skeleton motion . . . [,] which he would be allowed to amend and expand upon."[4]

In 2016, this Court held that Delaware's capital sentencing scheme was unconstitutional.[5] Cooke's sentence in consequence was modified to remove the previously imposed death sentence and to add a sentence of life imprisonment without benefit of probation or parole or any other reduction. That occurred during the summer of 2017. After Cooke appealed his modified sentence, this Court affirmed.[6] Cooke then petitioned the United States Supreme Court for a *writ of certiorari*, which was denied in June 2018.[7]

Finally, in February 2019, Cooke filed an amended Rule 61 motion ("Motion"), which, having been denied by the Superior Court, is before us now. The Motion spans 224 pages and includes 119 exhibits covering another 2,189 pages. Cooke advances numerous claims in the Motion, ranging from attacks on the effectiveness of Cooke's trial counsel to allegations that the investigating officers and prosecutors falsified, suppressed, and destroyed material evidence. But

---

[4] Letter/Order Issued by Judge Carpenter, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Mar. 3, 2015) (D.I. 516).
[5] *Rauf v. State*, 145 A.3d. 430 (Del. 2016).
[6] *Cooke v. State*, 181 A.3d 152, 2018 WL 1020106 (Del. 2018) (TABLE).
[7] *Cooke v. Delaware*, 585 U.S. 1024 (2018).

ironically enough—given the centrality of his claim during his initial direct appeal that he was competent to stand trial—the pivotal allegation underpinning most of Cooke's arguments now is that he was so obviously incompetent to stand trial a second time that his lawyers and the Superior Court should have recognized it and taken remedial action. The record does not support Cooke's remarkable *volte-face*. For this and other reasons, all of which we set forth in detail below, we affirm the Superior Court's denial of Cooke's motion for postconviction relief.

I

The record in this case is massive. After all, the case is nearly two decades old and comprises two trials, the first lasting 22 days and the second 18 days; two direct appeals; and a Rule 61 evidentiary hearing held over a span of 12 days. Each of these proceedings generated innumerable office conferences, hearings, and evidentiary exhibits. We do our best here to distill this voluminous record down to the facts, events, and rulings that are, in our view, essential to the reader's understanding of the relevant history and our resolution of Cooke's claims.[8]

---

[8] This task is facilitated by Cooke's concession that this Court's 2014 opinion "accurately details the facts established at [Cooke's] 2012 trial." Opening Br. at 3. *See Cooke v. State*, 97 A.3d 513 (Del. 2014).

## A

We begin with a review of the investigative facts that led to Cooke's arrest, indictment, and convictions.

Shortly after midnight on April 26, 2005, Cheryl Harmon returned to her apartment at the Towne Court Apartments in Newark. She immediately noticed writing on the wall and the smell of fingernail polish. Corporal Schwagel of the Newark Police Department responded to the apartment and he too smelled nail polish throughout the apartment. Written on the apartment's living room wall was the message "We'll be back." Corporal Schwagel also reported that "[o]n [Harmon's] bedroom door, 'Don't mess with my men' was written and, on a bathroom door was 'I what [sic] my drug money.'"[9] The messages appeared to have been written with red nail polish. Harmon reported that, when she had returned to the apartment that night, the only door to the apartment was locked, but she noticed that the lock on her living room window had been pried. Missing from her apartment were DVDs, an engraved class ring, rings from her jewelry box, and one bottle of red nail polish.

Three days later, shortly before 11:00 p.m., Amalia Cuadra returned to her house on West Park Place, not far from the Towne Court Apartments. Cuadra went

---

[9] Trial Tr. 151, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Feb. 5, 2007) (hereinafter "Trial Tr.").

to bed around 11:10 p.m.  She fell asleep but was awakened by a flashlight shining in her face.  The person holding the flashlight was at Cuadra's bedroom door.  At first, she thought it was her roommate Carolina, so she called Carolina's name two or three times.  But it was not Carolina; it was a man's voice that responded, "Shut the f*** up, shut the f*** up or I'll kill you."[10]  Cuadra fell silent, and the intruder spoke again, saying, "I know you have money.  Give me your f***ing money."[11]  Cuadra wrapped herself in a blanket, got out of bed, and walked to her desk to retrieve her wallet.  She gave the intruder $45.00, standing within two feet of him.  He was wearing "a gray hoodie, grayish knit gloves, some kind of a cap, [and] light blue pants."[12]  Cuadra described the intruder as stocky and three to four inches taller than her 5'3½" height.  He was "a very light skinned black man" who appeared to have either freckles or "bumps from . . . shaving"[13] on his face.

After Cuadra handed the intruder her cash, he demanded that she turn over her credit cards, barking, "Give me your f***ing credit cards or I'll kill you."[14]  Cuadra complied, giving the intruder two credit cards.  As Cuadra tried to unlock her cell phone to call 911, the intruder, who had told Cuadra that he had a weapon, once again threatened to kill her, this time if she did not accede to his demand that she

---

[10] *Id.* at 177.
[11] *Id.*
[12] *Id.* at 181.
[13] *Id.* at 183.
[14] *Id.* at 184.

7

take off her "f***ing clothes."[15]  Cuadra then screamed for her roommate Carolina three times and, hearing that and seeing that Cuadra had called 911, the intruder fled. After the police arrived, Cuadra and her roommate noticed that several items were missing, including an iPod, some diet pills, the roommate's cell phone, and a back pack with "Amalia Cuadra" embroidered on it.

The next evening, Lindsey Bonistall returned to her apartment in Towne Court Apartments—the same complex where Cheryl Harmon lived.  Bonistall had just watched Saturday Night Live with three friends in one of the friends' dorm room, putting the time of her return at approximately 1:00 a.m. on May 1.  Bonistall's roommate was out-of-town, so Bonistall was alone when someone broke into her apartment and attacked her.  Our 2014 opinion succinctly described in all its brutality what happened next:

> The intruder attacked Bonistall in her bedroom, tied her hands with an iron cord, and shoved a t-shirt into her mouth as a gag.  The intruder beat Bonistall, striking her above her eye and on her chin, and raped her.  The intruder then knelt on Bonistall's chest and strangled her to death, using another t-shirt that had been tied and knotted around her neck like a ligature.[16]

In an effort to destroy evidence, the intruder doused Bonistall's body in bleach, put it in the bathtub, heaped combustible materials (a wicker basket, a guitar, magazines, and a pillow) on top and set it aflame.  This occurred around 1:45 a.m.,

---

[15] *Id.* at 185.

[16] *Cooke*, 97 A.3d at 519 (footnotes omitted).

less than an hour after Bonistall had returned to her apartment. The fire had burned or smoldered, according to the Fire Marshal, for at least an hour before it was extinguished.

Several hours after that, during the late morning hours of May 1, the Fire Marshal summoned Detective Andrew Rubin of the Newark Police Department to Bonistall's apartment. As the detective walked through the apartment, he noted that "KKK" was written on two doors and the kitchen counter. The phrase "White Power" had been written in the kitchen area, and more ominously, the statement "More bodies are going to be turning up dead" was written on another wall. Soon after that, the Fire Marshal discovered Bonistall's charred and lifeless body under the pile of burnt rubble in the bathtub. An autopsy determined that the cause of Bonistall's death was strangulation and that she had died before the fire was started.

It did not take long for the investigating police officers to determine that Bonistall's murder was connected to the Harmon and Cuadra break-ins. On the day following the discovery of Bonistall's body and after the Newark Police Department had issued a press release asking citizens with information regarding the Harmon break-in and the Bonistall murder to contact Detective Rubin, the Newark Police Department's 911 call center received an anonymous call. The caller asked to speak with Detective Rubin. When he learned that the detective was unavailable, he told

9

the dispatcher that he could "tell [the police] who killed that girl."[17] He also provided information linking the Harmon and Cuadra break-ins to the Bonistall murder. Before the call, the officers investigating the Bonistall murder suspected that the Cuadra crime was related but were unaware of the Harmon burglary. The caller soon drew the connection between the three crimes, mixing in references to the collection of drug money and the specter of future killings. But more significantly, the caller shared details of the crimes that had not been disclosed to the public— evidence that the caller was either the perpetrator or knew who was.

Among other previously undisclosed facts, the caller mentioned entry into a house where a woman named "Cheryl" lived, an apparent reference to the Harmon burglary. That disclosure came on the heels of the caller's explicit reference to "Miss Carolina," the roommate whose name Amanda Cuadra had called out when confronted by the intruder in her bedroom. Tellingly, the caller pronounced Carolina's name "Carol-EE-na," just as Cuadra had called out in the presence of the intruder a few nights before. The caller claimed that he was involved in the Harmon and Cuadra break-ins with others but seemed to attribute the Bonistall murder exclusively to others. Despite the absence of any public disclosure about the writing on Bonistall's walls and the fact that she was tied up around the time of the murder, the caller offered that "they tied the girl up and killed her and they be writing on the

---

[17] State's Ex. 67, 2:35, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct.).

walls about KKK, White Power."[18]  A few days later, the caller called the Newark 911 center twice more, this time identifying himself as "John Warn" and providing what further investigation disclosed were false leads about "the man that been around there invading homes."[19]

On the same day—May 2—that the 911 call center received the anonymous call, JP Morgan Chase discovered that someone had attempted to withdraw cash from an ATM not far from Cooke's residence using Cuadra's stolen credit card.  The attempted withdrawal occurred within a short few hours of the theft.  The police collected the ATM video surveillance footage from the bank and developed still photographs of the individual—dressed in a gray hooded sweatshirt and wearing what appeared to be wool gloves—who had attempted the withdrawal.  When shown the still photographs, Cuadra said that she believed that the man depicted in them was the same man who had accosted her in her bedroom.  Pressed at trial to describe the certainty of her belief on a scale of one to ten, ten representing absolute certainty, she rated it as a nine.

The police created a wanted poster containing still photographs from the bank surveillance camera and a composite sketch derived from Cuadra's description.

[18] *Id.* at 7:41.
[19] State's Ex. 68, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct.).  In the first of these two May 7 phone calls the caller identified three individuals—Robert Selby, Jay Adams, and John Adams—and said that they worked at 700 Plus Food Mart on the Avenue of the States in Chester, Pennsylvania.  Detectives followed up on this lead only to learn that no one by those names worked there.

11

Addressing Cooke's direct appeal in 2014, this Court described the Newark Police Department's deployment of the poster with the still photograph and its role in identifying Cooke as the person who burgled Cuadra's residence and who later murdered Bonistall:

> The Newark Police used the ATM surveillance video from the Cuadra robbery to create a wanted poster for Bonistall's murderer, which was displayed around Newark, including at the Payless shoe store where Cooke worked part-time. [Rochelle] Campbell [Cooke's girlfriend], Cooke's coworkers from the Payless shoe store, and a woman who recognized Cooke from seeing him playing basketball in nearby Dickey Park, all identified Cooke as the man in the posters. They based their identification in part on the distinctive way the man in the poster stood on his toes and the type of gloves he was wearing. Both the distinctive foot position and the gloves were characteristics these witnesses associated with Cooke. The gloves contained small grips on the inside of the hand in a dotted pattern. The same dotted grip pattern from the gloves was found on the balcony railing outside Bonistall's apartment, on a CD cover in her living room, and on her bed sheets.[20]

One of Cooke's coworkers emphasized that the way the person depicted in the poster was standing and how he walked in the video she eventually watched made it "clear to [her] that it was [Cooke]."[21]  The woman who knew Cooke from Dickey Park reacted similarly:

> [Cooke] always walked on his tippy toes, and he always ran - - everything was done on his tippy toes. So, then I noticed the way he was walking down here, how his heel was up in the air.
> . . .
> I called him the Tippy Toe Man.[22]

---

[20] *Cooke*, 97 A.2d at 521 (footnotes omitted).
[21] App. to Answering Br. at B534.
[22] Trial Tr. 178, Mar. 22, 2012.

Notably, according to a psychiatric evaluation Cooke submitted in this postconviction relief proceeding, a scalding incident when Cooke was two-years old and consequent surgeries caused a deformity in Cooke's left foot, and his right foot functioned poorly. "Thereafter, Mr. Cooke was able to walk only on the balls of his feet."[23]

With this identification in hand, the police fixed their attention on Cooke. On June 6, Detective Rubin interviewed Rochelle Campbell, Cooke's girlfriend and the mother of three[24] of his 14 children. At the time, Cooke and Campbell, who had been together intermittently for ten years, were living together at 9 Lincoln Drive in Newark, within sight of Harmon's, Cuadra's, and Bonistall's apartments.[25] In a June 6 interview, Campbell reported that, during the early morning hours of April 29, she saw Cooke in possession of a backpack that she had not seen before. The name tag on the backpack contained the name "Amelia." The backpack's contents included diet pills, a cell phone, and credit cards. She told Detective Rubin that Cooke said

---

[23] App. to Opening Br. at A2652.
[24] When the crimes under discussion were committed, Campbell was pregnant with her fourth child by Cooke.
[25] According to Detective Rubin's trial testimony, Cooke and Campbell's residence was 125 feet from Harmon's apartment, 420 feet from Bonistall's, 1,222 feet (less than a quarter of a mile) from Cuadra's apartment, and 1,700 feet (less than one-third of a mile) from the ATM machine described above.

13

that he planned to try to use one of the credit cards and, in fact, left the residence but returned soon after, saying he tried but was unable to use the card.[26]

The day after Rubin interviewed Campbell, Cooke was arrested at his sister's house in Wilmington for the rape and murder of Lindsey Bonistall and crimes committed when he unlawfully entered the apartments of Cheryl Harmon and Amelia Cuadra. During lengthy questioning, Cooke denied that he knew Bonistall.

Despite Cooke's protestations of innocence, the forensic evidence mounted against him. A hooded sweatshirt found at his sister's Wilmington residence where Cooke was arrested had Bonistall's hair on it. A handwriting analyst—also referred to as a questioned document examiner—compared handwriting samples known to be written by Cooke with the writings found on the walls of Harmon's and Bonistall's apartments. The analyst opined that it was not possible to determine with any degree of certainty whether Cooke did or did not write the words that were written in nail polish on the walls and doors of Harmon's apartment. But because there were "some general features in agreement" between the known and questioned samples, the analyst could not rule out Cooke as the author.[27] By contrast, however,

---

[26] Compared to this summary of what Campbell shared with Detective Rubin on June 6, her trial testimony concerning the backpack and credit card was more detailed and included Cooke's explanation of how he came to possess the backpack. He claims that night that he came upon an accident scene where two college students were detained by police "[a]nd the backpack was just . . . there and that he walked up and took the bag and brung it into the house." Trial Tr. 173, Mar. 26, 2012.

[27] Trial Tr. 169, Mar. 20, 2012.

14

the analyst found "strong indications" that Mr. Cooke "probably" wrote the messages on the walls, door, and counter of Bonistall's apartment.[28] More damning yet was the DNA evidence derived from scrapings recovered from Bonistall's fingernails and sperm cells extracted from her vagina. The fingernail scrapings contained a mixture of Bonistall's and Cooke's DNA, and the DNA recovered from Bonistall's vaginal area was consistent with Cooke's DNA profile.[29] In fact, according to the prosecution's DNA expert, "[t]he probability of randomly selecting an unrelated [African American] individual with a DNA profile matching that of . . . the vaginal swab sperm fractions and James Cooke" is one in 676 quintillion (676,000,000,000,000,000,000).

Confronted with the evidence described above—and much more—Cooke stood trial in the Superior Court in February and March 2007. The operative indictment, returned by a New Castle County grand jury in August 2005 and as to which Cooke had pleaded not guilty and demanded a jury trial, contained 11 counts: murder in the first degree (Bonistall), rape in the first degree (Bonistall), felony murder in the first degree (murder during the rape of Bonistall), burglary in the first degree (Bonistall's apartment), arson in the first degree (Bonistall's apartment), reckless endangering in the first degree (the fire in Bonistall's apartment), burglary

---

[28] *Id.* at 170.
[29] State's Ex. 90, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct.); State's Ex. 91, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct.).

in the second degree (Cuadra's apartment), robbery in the second degree (Cuadra), misdemeanor theft (Cuadra), burglary in the second degree (Harmon's apartment), and misdemeanor theft (Harmon). The State sought the death penalty on each of the murder counts.

After a 22-day trial, the jury returned a guilty verdict on all counts. And after a five-day penalty phase hearing, the jury unanimously recommended that the court impose a death sentence. After a careful consideration of the trial and penalty-phase record—reflected in the 98-page Sentencing Decision[30]—the Superior Court concluded that the appropriate sentence was death as to each murder count.

## B

Because this Court reversed Cooke's convictions and sentences and the convictions from which he now seeks relief were the product of his retrial in 2012, our discussion of Cooke's first trial in 2007 focuses on those aspects of it that bear upon Cooke's present claims. In this regard, because Cooke's claims are grounded on the premise that his counsel during his 2012 trial were ineffective, it is important that we understand what came before—that is, what Cooke's lawyers knew as they prepared to defend him in 2012. And we can derive much of that understanding from the record of Cooke's trial in 2007 and the direct appeal that followed.

---

[30] *State v. Cooke*, 2007 WL 2129018 (Del. Super. Ct. June 6, 2007).

16

At an office conference two weeks before Cooke's 2007 trial was to begin, Cooke's counsel alerted the trial judge that "Mr. Cooke has one idea about how to defend this case; his counsel has a different idea."[31] The source of this disagreement was defense counsel's view that Cooke could maintain his innocence at trial while counsel could simultaneously urge the jury to find Cooke guilty but mentally ill ("GBMI") under 11 *Del. C.* § 401(b).[32] Defense counsel was of the view that Cooke's "intended course of defense"—maintaining his innocence—"will likely increase his chances for conviction and likely a death sentence."[33] By contrast, although a GBMI claim does not constitute a "defense" to criminal liability, it has been presumed to be "of benefit to the defendant, since it affords him a right to treatment and might, in theory, weigh in favor of a lighter sentence."[34]

The tension between Cooke's desire to maintain his innocence and his lawyers preferred strategy before the trial began was summarized by this Court in our 2009 opinion on direct appeal:

---

[31] Tr. of Office Conference at 64, *State v. Cooke*, Cr. ID. No. 0506005981(N) (Del. Super. Ct. Jan. 19, 2007).

[32] In 2007, 11 *Del. C.* § 401(b) provided that "[w]here the trier of fact determines that, at the time of the conduct charged, a defendant suffered from a mental illness or mental defect which substantially disturbed such person's thinking, feeling or behavior and/or that such mental illness or mental defect left such person with insufficient willpower to choose whether the person would do the act or refrain from doing it, although physically capable, the trier of fact shall return a verdict of 'guilty, but mentally ill.'"

[33] Tr. of Office Conference at 64, *State v. Cooke*, Cr. ID. No. 0506005981(N) (Del. Super. Ct. Jan. 19, 2007).

[34] *Sanders v. State*, 585 A.2d 117, 131 (Del. 1990).

It is also apparent from the transcript that Cooke had disclosed his disagreement with counsel during his interviews with psychiatrists. During an interview with Dr. Alvin Turner, a psychologist who later testified for the defense, Cooke admitted and also denied, the crimes, but repeatedly stated that he did not agree with the mental illness evidence his counsel wanted to present at trial because he was not guilty and not mentally ill. The prosecutor, who had read the doctors' reports produced during discovery, explained to the trial judge that, "according to Dr. Turner's report, the defendant admitted murdering Ms. Bonistall and then denied it. What he told Dr. Mechanick is that he never told Dr. Turner he killed Lindsey Bonistall . . . but this mentally ill stuff is all garbage and he's sane."

Defense counsel knew that Cooke wanted to maintain his factual innocence. Defense counsel explained that they believed that Cooke was "certainly entitled under the law to testify in any way he deems appropriate" and that Cooke would likely testify that "he had consensual sex with Lindsey Bonistall, he left and after that she must have been murdered by somebody else. I know nothing about it." But, defense counsel also explained they felt that they could not in good faith make the same argument. In their view, "that does not preclude counsel from pursuing a claim of guilty but mentally ill." Finally, defense counsel explained that they were bringing up the issue at the pre-trial conference because they thought that the trial judge needed to engage in a colloquy with Cooke and address the disagreement on the record prior to trial. Defense counsel was concerned that failure to address the disagreement prior to trial might result in "some kind of disastrous [sic] happening during trial," such as an outburst by Cooke.[35]

The State opposed the presentation of evidence by the defense in support of a GBMI verdict given that Cooke continued to maintain his innocence. After the court rejected the State's suggestion that the court engage in a colloquy with Cooke to gauge his intentions, the State moved *in limine* to preclude the GBMI evidence

_____

[35] 977 A.2d at 814 (footnote omitted).

18

unless either: (1) defense counsel informed the trial judge that there was no longer a dispute with Cooke about whether to pursue the GBMI verdict and that Cooke agreed with the presentation of evidence to support the verdict, or (2) the trial judge engaged in a colloquy with Cooke and determined that Cooke agreed with his counsel's decision to seek a GBMI verdict. The trial court denied the motion, and Cooke's trial began with the conflict between defense counsel's preferred strategy and Cooke's adherence to his claim of innocence unresolved.[36]

The conflict came to the fore almost immediately when, in his opening statement, defense counsel told the jury that "what the defense in this case is going to do is . . . prove that Mr. Cooke is mentally ill."[37] During the court's colloquy with Cooke following opening statements, Cooke made it clear that he had not consented to this defense, objecting to this counsel's strategy "to make it look like [he was] this mentally ill person."[38]

Cooke's unhappiness with his counsel's strategy and cross-examination during the State's case-in-chief manifested itself in a series of outbursts, both in and

---

[36] The State petitioned this Court for a writ of mandamus to compel the trial court to preclude the introduction of evidence supporting a GBMI verdict. *See* Compl. in Proceedings for Extraordinary Writ, *In re Petition of State for a Writ of Mandamus*, 918 A.2d 1151 (Del. Feb. 6, 2007) (No. 54, 2007). We denied the petition because the State failed to establish a "clear legal right" requiring the trial judge to preclude introduction of evidence supporting a GBMI verdict. *In re Petition of State for a Writ of Mandamus*, 918 A.2d at 1157.

[37] Tr. of Def.'s Opening Statement at 3, *State v. Cooke*, Cr. ID. No. 0506005981(N) (Del. Super. Ct. Feb. 2, 2007).

[38] Trial Tr. 90, Feb. 2, 2007.

outside the presence of the jury, testy exchanges between Cooke and the trial judge, and periodic removal of Cooke from the courtroom.[39] Throughout, despite the trial judge's painstaking effort to address Cooke's concerns regarding the fairness of the proceedings, Cooke's courtroom behavior ranged from combative to belligerent.

Two of Cooke's outbursts prompted his counsel to move for a mistrial. In denying one of those motions on the ground that Cooke's outbursts were voluntary, the trial court's assessment of Cooke and his antics is of particular relevance now:

> I start from the premise that *there's been no dispute about this defendant's competence to stand trial . . .* that he's been found competent to stand trial . . . . That means he's competent to assist counsel or not assist counsel. He does not assist counsel by these outbursts. The issue of these outbursts, it's a little hard to say, because . . . while the Court has read some of the material submitted by the parties in connection with . . . partly the issue raised in the writ of mandamus, as well as the ongoing matter in this Court, as far as the claims by Mr. Cooke about his wishes versus . . . how defense counsel have approached this case. Again, *there's nothing in what I have read in the reports from the two experts retained by the defense which would indicate . . . that Mr. Cooke is incapable of standing trial [or] incapable of making conscious decisions about things,* including how he conducts himself in this courtroom or in court . . . .[40]

Amidst the turmoil created by the divergence of Cooke's and his counsel's favored trial strategies and Cooke's defiant courtroom behavior, the prosecution presented a compelling case against Cooke in its case-in-chief. In earlier pages, we provided a broad outline of the evidence gathered by the Newark Police Department

---

[39] *See Cooke*, 977 A.2d at 821.
[40] Trial Tr. 108–09, Feb. 15, 2007 (emphasis added) (quoted in *Cooke*, 977 A.2d at 827).

20

as they investigated the Harmon and Cuadra burglaries and the Bonistall rape/murder. Much more could be said of the gruesome details surrounding the latter of these dreadful crimes. Those facts are ably recorded in the Sentencing Decision by the trial judge who presided over Cooke's 2007 trial.[41] It suffices, however, in our current context—a motion for postconviction relief that does not assert that Cooke is innocent—to summarize the evidence that demonstrated that it was Cooke, and no one else, who committed each of the crimes charged.

For starters, Cooke's image was captured by surveillance video when he attempted to use Cuadra's stolen credit card; he was wearing a gray hooded sweatshirt and wool gloves and standing on his "tippie toes," a distinctive stance that facilitated identification of the person in the video and still shots of Cooke by his co-workers and neighbors. This identification was corroborated by Rochelle Campbell, who knew Cooke intimately for ten years. Campbell listened to the recordings of the 911 calls received by the Newark Police Department in the days following the discovery of Bonistall's body; she was 100% certain that the voice in all the calls was Cooke's. And a pair of wool gloves was found in Cooke's house. The recovered gloves contained small grips in a dotted pattern that matched the pattern found at the point of entry to Lindsey Bonistall's apartment.

---

[41] *Cooke*, 2007 WL 2129018.

The prosecution also established that Cooke fled from Newark following the murder. In the month between his flight and arrest in early June 2005, Cooke committed four similar home invasions in New Jersey.

And finally, the forensic evidence—that is, the handwriting analysis of the writing on the walls of Harmon's and Bonistall's apartments, Bonistall's hair on the hooded sweatshirt found at Cooke's sister's residence, and the DNA evidence from Bonistall's fingernails and vagina—pointed convincingly at Cooke.

The defense fought back, but as foreshadowed above, it was far from unified. In its presentation of witness testimony and documentary evidence, the defense was heavily, if not exclusively, influenced by Cooke's counsel's pursuit of a GBMI verdict. Cooke's family members and voluminous records from the New Jersey Division of Youth and Family Services painted a picture of severe abuse suffered by Cooke in his childhood, frequently inflicted by his mother. The defense also called a psychologist, Dr. Alvin Turner, who opined that Cooke suffered from Schizotypal Personality Disorder. Dr. Turner described this disorder as "a transient psychotic state that comes from a history of traumatization . . ."[42] According to Dr. Turner, a person "who has Schizotypal Personality Disorder[,] such as James [Cooke] has, has

---

[42] Trial Tr. 97, Feb. 20, 2007.

22

no capacity really to control his behavior."[43]  At no time did Dr. Turner opine that Cooke was not competent to stand trial.

Dr. Turner's diagnosis was based in part on his clinical interviews of Cooke, the recounting of which revealed facts inconsistent with Cooke's claim of innocence in Bonistall's murder.  These are Dr. Turner's words:

> [H]e told me that he remembers some aspects of the -- event.  He told me he remembers having sex with [Bonistall], which he considered consensual.  He said that she participated in it after they were both smoking wet.  Wet is marijuana mixed with some kind of chemical, I think its embalming chemical, and that she smoked a little bit but she didn't like it and he smoked more of it before they had sex . . . . [D]uring the act he said that he got angry at her because she didn't want to put her legs up in the air, she wanted it like she wanted it and he remembers being angry at her and sitting on the side of the bed.  And he remembers standing up, with her sitting on the bed, and choking her. He said that he didn't understand why he did it.[44]

Cooke also told Dr. Turner that he did not intend to kill Bonistall but that "[s]tuff started getting out of hand, [and he] blacked out," after which he "tried to act like everything was normal."[45]  But, then again, there were times when Cooke would deny that he even said these things to Dr. Turner and other times when he would tell Dr. Turner that he was "playing" with him and "didn't really mean" what he had told him.[46]

---

[43] *Id.* at 99
[44] *Id.* at 93–94.
[45] *Id.* at 94.
[46] *Id.*

23

Following Dr. Turner's testimony, the defense called Dr. Lawson Bernstein, a neuropsychiatrist who had conducted one clinical interview of Cooke in mid-2006. Dr. Bernstein diagnosed Cooke with "a mixed personality disorder . . . with schizoid, schizotypal and paranoid features."[47]  During the interview, Cooke told Dr. Bernstein that he had consensual sex with Bonistall, which the doctor found "fantastic . . . [a]s in unbelievable."[48]  Like Dr. Turner, Dr. Bernstein did not opine that Cooke was incompetent to stand trial.

After Dr. Bernstein, the defense called two relatively inconsequential witnesses.  The first, Donald Napolin, was the mental health director at "Gander Hill Prison," now known as Howard R. Young Correctional Institution, where Cooke was detained pending trial.  Napolin testified that he met Cooke after Cooke was found guilty of painting his cell walls with feces and putting it in his mouth.  Napolin diagnosed Cooke with psychotic disorder, NOS (Not Otherwise Specified) and ordered him to be on Psychiatric Close Observation level 2.  The second, Reverend James Beardsley, was called ostensibly to testify about Cooke having admitted to killing Bonistall, but Reverend Beardsley's testimony was cut short when Cooke expressed his unwillingness to waive religious privilege under D.R.E. 505.

---

[47] Trial Tr. 114, Feb. 21, 2007.
[48] *Id.* at 259.

After that, Cooke's lawyers requested an *ex parte* office conference with the trial judge to discuss Cooke's decision to testify despite their advice that doing so would not serve his best interests. In the conference, counsel expressed his opinion that Cooke's testimony "could be a one-way ticket to the death house. . . ."[49] Cooke had advised counsel that he had consensual sex with Bonistall but then left her apartment and that someone else must have killed her. But counsel had formed "the belief [] beyond a reasonable doubt"[50] that Cooke was guilty of the charged offenses. Counsel did not see Cooke's intended testimony as perjury because they believed that Cooke believed that he did not commit the crimes with which he was charged. Still, they did not want to participate in a direct examination of Cooke that they saw as gravely in conflict with Cooke's best interests. Thus, they proposed that the court introduce Cooke to the jury so that he could testify in a narrative form as courts have permitted when an attorney refuses to cooperate with a client's presentation of perjured testimony. The court agreed to proceed in this manner.[51]

The first words out of Cooke's mouth after he was sworn renounced his lawyers' strategy: "First of all, I'd like to say I never picked the mentally ill defense.

---

[49] Tr. *Ex Parte* Office Conference at 3, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Feb. 22, 2007) (D.I. 287).
[50] *Id.*
[51] *See Shockley v. State*, 565 A.2d 1373, 1376–80 (Del. 1989).

That was my public defenders' idea."[52]  Cooke then denied that he had murdered

Bonistall but claimed that he had consensual sex with her.  In rambling fashion, he

discussed what he perceived to be holes in the State's case, paying special attention

to the hair evidence, Amalia's identification of Cooke, and an unidentified footprint

in Bonistall's apartment.  The theme pervading Cooke's narrative was that his

lawyers were complicit in an unfair and racially motivated prosecution.  The trial

judge was forced to excuse the jury three times during Cooke's testimony because

Cooke continuously disregarded the court's instructions regarding the permissible

bounds of his testimony.

In response to the defense's presentation and counsel's quest for a GBMI

verdict—as opposed to a straight guilty verdict—the State offered rebuttal evidence

from a clinical and forensic psychiatrist, Stephen Mechanick, M.D., who challenged

Dr. Turner's and Dr. Bernstein's diagnoses, as well as evidence relating to Cooke's

post-murder criminal conduct in New Jersey.

Dr. Mechanick was the State's first rebuttal witness.  Although in the vast

majority of the criminal cases in which Dr. Mechanick had testified he had done so

as a defense witness, in this case, the State retained him to evaluate Cooke's

psychiatric condition.  To that end, Dr. Mechanick reviewed a panoply of materials

---

[52] Trial Tr. 137, Feb. 22, 2007.  Cooke returned to this theme later:  "I'm not mentally ill.  They know I'm not mentally ill.  I'm quite sure the prosecutor know[s] I'm not mentally ill.  And the judge even know[s] I'm not mentally ill." *Id.* at 146.

related to, among other things, Cooke's mental health history and the crimes charged, met with Cooke for "[a] little less than three hours,"[53] and issued as 28-page report, entitled "Psychiatric Evaluation of James Cooke." The report was admitted into evidence without objection.

The central thrust of Dr. Mechanick's findings was that Cooke did not suffer from Schizotypal Personality Disorder as Dr. Turner opined, nor did he suffer from a mixed personality disorder with schizoid, schizotypal, and paranoid features as Dr. Bernstein had concluded. Instead, it was Dr. Mechanick's opinion to a reasonable degree of medical certainty that Cooke had an Antisocial Personality Disorder. This distinction was critical to the prosecution's strategy for avoiding a GBMI verdict: as the abnormality known as Antisocial Personality Disorder is an "abnormality manifested only by repeated criminal or other antisocial conduct;"[54] as such—and as the trial judge ultimately instructed the jury—it is not the type of psychiatric disorder that will support a mental illness defense under 11 *Del. C.* § 401(c).[55] As

---

[53] Trial Tr. 22, Feb 26, 2007.

[54] The pertinent sentence in 11 *Del. C.* § 401(c) states that "[a]s used in this chapter, the terms 'insanity' or 'mental illness' do not include an abnormality manifested only by repeated criminal or other antisocial conduct." *See also Magner v. State*, 718 A.2d 528, 1998 WL 666726, at *1 (Del. July 29, 1998) (TABLE). ("A defendant suffering from anti-social personality disorder may not assert mental illness as a defense."). In his direct appeal, Cooke argued that the trial court's GBMI instruction was deficient because it did not require the State to prove by a preponderance of the evidence that Cooke suffered from antisocial personality disorder. Because the Court reversed on other grounds, this argument became moot and hence was not addressed.

[55] *See* Charge to the Jury, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Mar. 5, 2007) (D.I. 201).

Cooke conceded in his direct appeal, "[t]he jury ultimately agreed with [Dr.] Mechanick's opinion[,]"[56] as evidenced by its straight guilty verdict.

But the relevance of Dr. Mechanick's evaluation of Cooke to Cooke's present claims of ineffective assistance of counsel extends well beyond his diagnosis of Cooke's personality disorder. Although largely cumulative of what Cooke had told Drs. Turner and Bernstein, he told Dr. Mechanick that he had known Lindsey Bonistall for "a number of months before her death[]"[57] and that their relationship was centered around "weed." Cooke once again shared his tale of consensual sex but denied that he had killed Bonistall.

More important for present purposes though is Dr. Mechanick's opinion concerning Cooke's competency to stand trial. True, he was not specially tasked with assessing Cooke's competency in the lead-up to his 2006 evaluation. Yet he offered the following opinion, stated to a reasonable degree of medical and psychiatric certainty:

> It is my opinion that Mr. Cooke is currently capable of assisting his attorney in the preparation and conduct of his defense. It is my opinion that Mr. Cooke's expressed mistrust of his attorney and the legal system is typical of defendants in a criminal proceeding and is not indicative of any psychiatric condition other than his Antisocial Personality Disorder. It is my opinion that Mr. Cooke's expressed mistrust of his attorney is also related to his wish to get out of prison and his unwillingness to accept any defense that would not help him to achieve that outcome. It is my opinion that Mr. Cooke's current psychiatric

---

[56] Opening Br. at 26, *Cooke*, 977 A.2d 803 (Nos. 289 and 324, 2007).
[57] App. to Opening Br. at A2707.

28

condition is consistent with the finding that he is competent to stand trial.[58]

In support of Dr. Mechanick's Antisocial Personality Disorder diagnosis, the State then offered evidence of Cooke's post-offense criminal conduct in New Jersey. Before allowing this testimony concerning Cooke's criminal conduct in Atlantic City in early June 2005—two days before his arrest—the court instructed the jury that the purpose for which it could consider the evidence was limited. It was not to be considered "as proof that [Cooke was] a bad person and, therefore, probably committed the offenses with which he [was] charged in this [c]ourt."[59] Instead, according to the court, the jury was only to consider "whether or not [Cooke] suffered from a mental illness at the time of the alleged offenses charged in this case."[60]

At this juncture, the details of Cooke's criminal conduct in New Jersey are not particularly significant.[61] It is sufficient here to note that, in each of the three instances described by the State's witnesses, Cooked robbed his victim, twice after breaking into a residence and twice after threatening to kill the victim. Following this testimony, the State recalled Detective Rubin, the chief investigating officer, to clean up some loose ends, and then rested its rebuttal case.

---

[58] *Id.* at A2718 (bold in original omitted).
[59] Trial Tr. 21, Feb. 27, 2007.
[60] *Id.*
[61] For a concise summary of the State's evidence on this point, see the Superior Court's June 6, 2007 Sentencing Decision. *Cooke*, 2007 WL 2129018, at *18–19.

In the wake of the State's rebuttal testimony and evidence concerning the New Jersey incidents, Cooke expressed his desire to testify again. Cooke's counsel, however, advised him that he would be ill-served by testifying again, and the State strenuously objected to allowing surrebuttal testimony. The court overruled the State's objection and allowed Cooke to retake the stand, but not before driving home the point that, in doing so, Cooke was disregarding his lawyer's advice:

> THE COURT: You understand that your attorneys have advised you that, in their professional opinion, [testifying again] is not in your best interest? Do you understand that?
>
> THE DEFENDANT: Yes.
>
> . . .
>
> THE COURT: So you understand . . .that [your lawyers] believe you should not do this, but you are choosing to do it instead; correct?
>
> THE DEFENDANT: Yes.[62]

Cooke's surrebuttal testimony—again offered in narrative form—was inconsequential and, when it strayed beyond the parameters set by the trial judge, was promptly terminated.

After closing arguments and jury instructions, the jury deliberated for a day and a half before returning its verdict, finding Cooke guilty on all counts. Because the State was seeking the death penalty, the court was required to conduct a separate hearing—often referred to as the "penalty phase" of a capital trial—to determine

---

[62] Trial Tr. 87, Feb. 28, 2007.

whether Cooke should be sentenced to death or to life imprisonment without benefit of probation or parole.[63]

C

The intricacies of the penalty-phase procedure as our law stood in 2007 are irrelevant here; it suffices for our current purposes to recall that the procedure was "a fact-intensive inquiry at the ultimate stage of sentencing, in which the factors that aggravate toward a death sentence and mitigate against it are considered and weighed."[64] Nor need we now plumb the depths of the record of the penalty phase of Cooke's 2007 trial. As with our summary of the guilt phase of that trial, we take note of those aspects of the 2007 penalty hearing that will help us assess Cooke's postconviction-relief claims, especially those that turn on the reasonableness of his lawyer's decisions and performance in 2012; admittedly, they are few.

Dr. James Walsh, who holds master's and doctoral degrees in pastoral counseling, had met with Cooke on six occasions during the spring of 2006, each meeting lasting 90 minutes, for the purposes of conducting a psychosocial assessment. Dr. Walsh found Cooke to be "very open and cooperative[,] discussing

---

[63] *See* 11 *Del. C.* § 4209(b) (2023). As mentioned earlier, in 2016, this Court determined that the capital sentencing process embodied in § 4209 was unconstitutional. In 2024, the General Assembly amended § 4209, eliminating death as a punishment for first-degree murder and the procedural provisions governing the imposition of the death penalty. *See* 2024 Del. Laws Ch. 433 (2024) (effective Sept. 26, 2024).

[64] *Rauf v. State*, 145 A.3d 430, 435 (Del. 2016) (Strine, C.J., concurring).

31

his life to the best of his memory . . . ."[65]  According to Dr. Walsh, almost all of what Cooke told him, much of which related to Cooke's "horrific [life] from before he was born" could be "corroborated by the variety of reports [Dr. Walsh] read."[66] Cooke's childhood, Dr. Walsh learned, was marked by "physical abuse, emotional abuse and social and cultural deprivation."[67]

Another penalty-phase witness of note was Reverend James Beardsley, a Pentecostal minister, who had visited Cooke twice monthly since July 2005, that is for nearly two years.  Reverend Beardsley learned of Cooke's "conversion experience in 1997,"[68] which led to the two men frequently "interact[ing] in the scriptures."[69]  During this period, Reverend Beardsley felt as though Cooke showed him respect because he showed Cooke respect.

Cooke exercised his right of allocution and, although it was cut short when Cooke strayed beyond the guidelines the court had set for the allocution, Cooke once again avowed that he was not mentally ill.

These, to be sure, are but snippets from a penalty hearing that lasted over the course of five days and included heart-wrenching testimony from Lindsey Bonistall's friends and family.  But we mention them here as they bear upon the state

---

[65] Trial Tr. 130, Mar. 15, 2007.
[66] *Id.*
[67] *Id.*
[68] Trial Tr. 78, Mar. 16, 2007.
[69] *Id.* at 79.

32

of the record regarding Cooke's competency as his 2007 trial came to a conclusion. That ending came when the Superior Court adopted the jury's unanimous recommendation and imposed a sentence of death on the two murder convictions plus 107 years on the remaining offenses.

D

Cooke's trial counsel filed a timely notice of appeal[70] in this Court and then moved to withdraw from representing Cooke on appeal. Counsel expressed the view that there was "a colorable issue in [the] appeal that the Superior Court erred when it allowed counsel to seek a GBMI verdict over the defendant's objection."[71] This, according to Cooke's counsel, created a "unique positional conflict"[72] in that, if counsel were to press that issue, they would be arguing a position that was directly contrary to their position as taken previously in the Superior Court and before this Court in the mandamus action.[73] Counsel feared that this would invite questions concerning their credibility and performance at trial as well as their loyalty to Cooke.

---

[70] Under 11 *Del. C.* § 4209(g) as it existed in 2007, the Superior Court's imposition of the death penalty triggered automatic appellate review by this Court. This review, however, was limited to "the recommendation on and imposition of that penalty . . . ." That process was initiated in this case when the sentencing judge transmitted a certified copy of the Superior Court docket sheet, his sentencing opinion, and the death sentence to this Court. Cooke's trial counsel ensured that our review would extend beyond the limited scope of the § 4209(g) automatic appeal by filing a notice of appeal from all convictions and the sentences imposed by the Superior Court.

[71] Motion to Withdraw and/or Appoint Independent Counsel at 3, *Cooke*, 977 A.2d 803 (Nos. 289 and 324, 2007).

[72] *Id*. at 4.

[73] *See* Answer to Compl. for Writ of Mandamus by Office of the Public Defender, *In re Petition of State for a Writ of Mandamus*, 918 A.2d 1151 (No. 54, 2007).

The State did not oppose the motion, and this Court permitted counsel to withdraw, appointing two experienced criminal-defense practitioners to represent Cooke.

Because of the involvement of new counsel, the size of the record, and the number of potential appellate issues considered by counsel, Cooke's opening brief was not filed until mid-2008. In it, Cooke asserted nine separate grounds for reversal, six of which were the byproduct of Cooke's trial counsel's pursuit of a GBMI verdict despite Cooke's steadfast assertion of innocence. At the heart of these claims was Cooke's contention that, by allowing his counsel to pursue this strategy, it deprived him of his Sixth Amendment rights guaranteed by the United States Constitution. This argument—to the exclusion of the other issues Cooke raised—commands our attention here.

Cooke stated his position plainly:

> Cooke's lawyers had no authority to enter a plea of GBMI. *Three mental health experts reached the conclusion that Cooke was competent and the trial court found so. . . . As a competent individual, it was Cooke's individual and fundamental constitutional right to elect what plea to enter.* Cooke's plea was not guilty. Trial counsel had no authority nor right to change Cooke's plea without Cooke's knowing, intelligent and voluntary consent.[74]

Cooke chided his trial counsel, moreover, for taking a "distant paternalistic approach," favoring their own strategic preferences over Cooke's even though, as

---

[74] Opening Br. at 36, *Cooke*, 977 A.2d 803 (Nos. 289 and 324, 2007) (emphasis added).

Cooke argued, there was "no evidence in [the] record that Cooke was a client with diminished capacity."[75]

In our July 21, 2009 opinion, this Court embraced the fundamental premise of Cooke's argument and reversed his convictions and sentence.[76] Among other conclusions, we held that Cooke's trial counsel had infringed upon Cooke's right to plead not guilty, effectively negated his right to testify in his own defense, and deprived him of his right to an impartial jury trial. Justice Ridgely, writing for the Majority,[77] observed that "[i]n this case, *Cooke was competent to stand trial* and chose the alternative of a plea of not guilty over a plea of guilty but mentally ill."[78] The Court emphasized that, under these circumstances,

> the defendant has autonomy to make the most basic decisions affecting his case, including whether to plead not guilty and have a trial by jury where he has an opportunity to confront and cross-examine adverse witnesses, and whether to testify. Although these fundamental decisions are indeed strategic choices that counsel might be better able to make, because the consequences of them are the defendant's alone, they are too important to be made by anyone else. Moreover, counsel cannot undermine the defendant's right to make these personal and fundamental decisions by ignoring the defendant's choice and arguing affirmatively against the defendant's chosen objective.[79]

---

[75] Reply Br. at 8, *Cooke*, 977 A.2d 803 (Nos. 289 and 324, 2007).

[76] *Cooke v. State*, 977 A.2d 803 (Del. 2009).

[77] Chief Justice Steele, joined by Justice Jacobs, dissented, expressing the view that *Strickland v. Washington*, (*see infra* at 62–64ุ) applied to the Court's review of the adequacy of Cooke's trial counsel's representation and that counsel had satisfied that standard. *See Cooke*, 977 A.2d at 858–862 (Steele, C.J. dissenting).

[78] *Id.* at 842 (emphasis added).

[79] *Id.* (footnotes omitted).

Relevant to the claims Cooke now asserts, this Court took Cooke's trial counsel to task for overriding Cooke's attempt to exercise his autonomy and, instead, "insist[ing] on their own objective."[80]  Counsel's pursuit of a strategy that was independent of and inconsistent with Cooke's objective of securing a not guilty verdict "so undermined the proper functioning of the adversarial process that [Cooke's 2007] trial [could] not be relied upon as having produced a just result."[81]  Accordingly, this Court could "find no other alternative except to grant Cooke a new trial."[82]

E

Despite the appellate success of Cooke's second set of counsel, Cooke soon found fault with their representation.  Cooke named this set of counsel in three civil actions brought under 42 U.S.C. § 1983, alleging violations of his civil rights.[83]  He also communicated in some fashion[84] with the Office of Disciplinary Counsel concerning counsel's representation.  Not surprisingly, the adversarial nature of Cooke's stances toward his lawyers created a troublesome conflict of interests.  This

---

[80] *Id.* at 849.
[81] *Id.* at 850.
[82] *Id.*
[83] *See Cooke v. Wood*, 2011 WL 1542825 (D. Del. Apr. 21, 2011); *Cooke v. Goldstein*, 2011 WL 2119347 (D. Del. May 26, 2011); *Cooke v. Herlihy*, 2011 WL 2119351 (D. Del. May 26, 2011).
[84] Because the lawyer disciplinary process is, for the most part, confidential, the record of Cooke's communications with the Office of Disciplinary Counsel is unclear.

conflict arose at the same time that questions concerning Cooke's competency surfaced.

At an October 29, 2010 office conference, the purpose of which was to discuss the import of one of Cooke's federal lawsuits against his lawyers and others, including defense-retained experts, counsel described the quandary. At least two of the defense experts, one of whom was evaluating Cooke's competency, had been instructed by their lawyers to have no direct contact with Cooke so long as the litigation in which they were named was pending. Likewise, counsel had been advised by their professional-liability counsel to have "no further verbal contact with [Cooke], [and] only to have written contact only in connection with the murder case."[85]

Counsel for the State suggested that, "where there is a hint of significant conflict between trial counsel and client, . . . it is incumbent on the Court to engage in a colloquy with the defendant to work through the matter."[86] This, according to the State, "would be a way to move the ball down the field now that we represented to the Court that we believe as of today, there is a competency issue, at least potentially, that needs to be explored."[87] Cooke's counsel added that it was unclear whether the defense expert addressing competency—Dr. Eichel—would be able to

---

[85] App. to Opening Br. at A283.
[86] *Id.* at A284.
[87] *Id.* at A285.

"proceed and complete a report relating to [Cooke's] competency . . . ."[88] Cooke's counsel also reported that, as of her last consultation with Cooke, it was her opinion that he was not competent. The State responded that the court should "[o]rder [Cooke] to the State Hospital and have him reviewed for competency."[89] The State's suggestion prompted the court to order Cooke's counsel to file a written report within three days, stating their position on the State's application for a competency evaluation and advising the court as to Dr. Eichel's ability to complete his report.

On the appointed date, Cooke's counsel reported:

> I have spoken with Dr. Steve Eichel regarding the status of his evaluation of Mr. Cooke's competency. Dr. Eichel advised that he has not yet completed his evaluation of Mr. Cooke and is now unable to do so as he has been advised by counsel not to have any contact with Mr. Cooke. Accordingly, at least during the pendency of the civil suit in which Dr. Eichel is a defendant, defense counsel is unable to obtain a report relevant to the question of competency.[90]

As for the State's request for a competency evaluation, Cooke's counsel submitted that "[i]n light of the litigation Mr. Cooke filed against me and my partner, it would be a true conflict of interest for counsel to attempt to act in Mr. Cooke's best interest."[91] Given the advice she received from her own counsel, Cooke's counsel believed that Cooke's Sixth Amendment right to effective assistance of counsel might be compromised were she to take any positions on his behalf. Counsel

---

[88] *Id.* at A286.
[89] *Id.*
[90] *Id.* at A287.
[91] *Id.*

then suggested that the court defer its decision until the conflict issue was resolved and noted further that she intended to move to withdraw as Cooke's counsel.

Two days later, the court denied the State's request that Cooke be evaluated at the Delaware Psychiatric Center to determine his competency to stand trial. But the court agreed that an appropriate colloquy "will be held or will most likely be needed, it is too early in the process to do so."[92] The court also ordered briefing on the propriety of counsel's continued representation of Cooke, noting further that these developments rendered unrealistic the then-impending date for jury selection in Cooke's retrial..

Soon after, Cooke's second set of counsel moved to withdraw, citing a "palpable and irreparable"[93] breakdown in the attorney-client relationship. And within days the Superior Court held a hearing at which the principal event was a colloquy between Cooke and the trial judge. The main topics covered in the colloquy were Cooke's relationship with his counsel and the extent to which he would cooperate should his counsel—whoever that might be—send mental health professionals to evaluate Cooke.

---

[92] *Id.* at A289.
[93] Motion to Withdraw as Counsel and for the Substitution of New Counsel, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Dec. 6, 2010) (D.I. 331).

Cooke's responses to the court's questions were quarrelsome and accusatory.[94] But we are not concerned here with Cooke's courtroom demeanor. Instead, we focus on the message he communicated to the court—and, correspondingly, to the lawyers who would be representing him from that point forward. Cooke made it clear that he wanted nothing to do with the lawyers who were then representing him because they were not discharging their duties as he thought they should; for this reason, as far as he was concerned, Cooke had "fired" his lawyers. Cooke also understood that his lawsuit against his lawyers rendered their continued representation of him untenable. But he made it equally clear that he did not wish to proceed *pro se*.

As to his willingness to cooperate with mental health professionals, Cooke was equally single-minded. Although the trial judge's questions in the area related more to the development of mitigation evidence than to Cooke's competence, Cooke stated over and over again that he had no interest and would not cooperate with

---

[94] Among other things, Cooke accused his lawyers of drafting "fraudulent motions" and "hiding evidence" and the trial judge of encouraging his first-trial counsel "to deceive witnesses." Tr. of Hr'g and Colloquy at 6, 9, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Dec. 8, 2010).

mental health experts.[95]  And he repeatedly volunteered that he was competent to stand trial.[96]

Within two weeks of its colloquy with Cooke, the Superior Court granted Cooke's counsel's motion to withdraw and continued the February 2011 trial date. Not long after that, the trial judge, who had presided over Cooke's case since 2005, informed counsel of this Court's adoption of a new rule that required the judicial re-assignment of capital murder cases that had been reversed and remanded.[97]  The case was promptly reassigned, and in turn, the newly assigned trial judge appointed new counsel to represent Cooke.  When necessary to avoid confusion, we shall refer to these lawyers, who represented Cooke through his 2012 trial and the direct appeal that this Court decided in 2014, as "second-trial counsel."

---

[95] *Id.* at 8 (Cooke: "What are you sending them doctors to me for, when my thing is to say I'm innocent?  Do you hear me?  Why are you saying you want to see if I'm competence [*sic*]?  I am telling you now, I'm competence [sic] to stand trial."); *Id.* at 33 (THE COURT: "Suppose new lawyers need to . . . send you mental health experts - - ?"  COOKE: "No.  They don't need to do that."); *Id.* at 35 (COOKE: "No.  I'm not willing to talk to them.  You know that."  THE COURT: "Talk to what, any mental health experts?"  COOKE: "No.  I am not talking to them.  I am not talking to them."); *Id.* at 45–46 (THE COURT: "If I appointed new attorneys for you, what you're telling me is that you do not want them to send any mental health experts to you?"  COOKE: "That's what I said.  That's what I said."); *Id.* at 48 (COOKE: "They send one doctor to me, it's over.  They send one doctor to me, it's over.").

[96] *Id.* at 8 ("I am telling you now that I am competence [sic] to stand trial.); *Id.* at 51 ("I am competent to stand trial.").

[97] Supr. Ct. R. 19(d) as amended provided that "[i]n a Class A felony tried without a jury or a capital first degree murder case that is reversed and remanded by the Supreme Court to the Superior Court for a new trial or penalty hearing, the President Judge shall assign a different judge to preside over the case if the judge whose decision was reversed on appeal is the same judge who presided over the bench trial or the penalty hearing that result in the imposition of the death sentence."

41

When Cooke's second-trial counsel were appointed in March 2011, they were not presented with a blank canvas on which to paint. Cooke's 2007 trial and related proceedings had generated a hefty record, which included the testimony of percipient witnesses, experts in the analysis of DNA, hair, handwriting, psychology, psychiatry, and forensic pathology, as well as Cooke's testimony. They also had a client steeped in the history of the case and deeply entrenched in his belief about how his defense should be postured.

Cooke, with whom counsel "did not have any difficulty communicating . . . about trial strategy and potential defenses[,] . . . claimed that he was innocent explaining to counsel that he was engaged in an ongoing sexual relationship with [Bonistall]."[98] According to Cooke's counsel, Cooke "denied that he killed [Bonistall] . . . [and] insisted on testifying in his own defense to assert his innocence before the jury."[99] And consistently with what he had told the first-trial judge during the colloquy in late 2010, in one of counsel's first meetings with Cooke, when counsel broached the topic of competency, Cooke "informed [c]ounsel that he would

---

[98] App. to Answering Br. at B662.
[99] *Id.*

not cooperate with any type of mental health professional or any attempt to have him evaluated."[100]

With the stage thus set, Cooke's second-trial counsel began to prepare for Cooke's retrial, which was scheduled to begin in February 2012; they made discovery requests and filed the types of motions and engaged in the type of trial preparation activities one would expect to see in a case of this magnitude.[101] Among the many motions counsel filed was a motion to suppress the statements Cooke made while in the custody of the Newark Police Department on the night of his arrest as well as later statements he made to Atlantic City detectives.

Counsel's efforts on Cooke's behalf ran into turbulence when, at a hearing on November 10, 2011, ostensibly convened to address a motion to relocate Cooke and facilitate counsel's visits with him, Cooke emphatically announced that he had "fired" counsel.[102] This prompted the court to request submissions from the parties addressing the significance of what the State described as Cooke's "repetitive and unambiguous requests this afternoon to represent himself . . . ."[103]

---

[100] *Id.* Cooke did, however, "begrudgingly agree[] to cooperate with the defense mitigation expert."
[101] As court-appointed counsel, counsel needed court approval for the expenditure of funds and thus filed motions for authority to hire private investigators and a forensic pathologist. Cooke's counsel also moved to "exclude prior rulings from the law of the case" and, as noted above, moved to suppress evidence.
[102] App. to Opening Br. at A371.
[103] *Id.* at A373.

In their submission, Cooke's second-trial counsel expressed their view that Cooke had an "absolute right"[104] to represent himself provided he satisfied the criteria recognized in *Faretta v. California*.[105] This would require, among other things, that the trial court satisfy itself that Cooke was knowingly and intelligently waiving "the traditional benefits associated with the right to counsel."[106] Thus, Cooke's competency would be relevant to the court's inquiry. Cooke's counsel offered his take on this issue:

> As to . . . [the] defendant's competency, Mr. Cooke has demonstrated through various writings that he is able to follow certain procedures and appears to be literate when it comes to writing lawsuits[;] however, to assure one's self[] that he is competent, the issue of mental competency may need to be addressed by a medical expert. For the record, counsel for the most part has been able to deal with Mr. Cooke, but for the interference that we have faced with prison authorities up to this point.[107]

After proposing that the court engage in a rigorous colloquy with Cooke, counsel concluded:

> It is defense counsel's belief that Mr. Cooke should not represent himself[;] however, that is a decision that can be made only by Mr. Cooke. If Mr. Cooke meets the criteria as set out in <u>Faretta v. California</u>, and properly answers the required questions during his colloquy, Your Honor would have no choice but to allow him to represent himself. A full colloquy with Mr. Cooke as well as any

---

[104] App. to Answering Br. at B347.
[105] 422 U.S. 806 (1975).
[106] *Id.* at 835.
[107] App. to Answering Br. at B347.

competency testing that Your Honor decides is needed must be carried out before a final decision is made.[108]

The trial court engaged in the required colloquy on November 30, 2011, two and one-half months before the scheduled trial date. The colloquy was extensive and detailed, so much so that it is impracticable to repeat every question and answer here. After confirming that Cooke still wished to proceed *pro se* and asking him about his educational background (he is a high school graduate) and employment status when he was arrested (stock clerk at a Payless shoe store), the court asked Cooke a series of questions to ascertain whether his decision was knowing and intelligent. The court's questions then probed Cooke's understanding of, among other things, the nature of the charges, the penalties upon conviction, the procedure to be followed given that there were two charges of capital murder, and the dangerous pitfalls that attended self-representation in a complex criminal trial. Cooke answered that he understood all these things and that no one was pressuring him to waive counsel and proceed *pro se*. The record also reflects that Cooke's counsel explained to Cooke that it was not in his best interests to represent himself, advice that the trial judge echoed during the colloquy.

After the colloquy, Cooke's counsel reiterated his belief that Cooke was not competent to represent himself, distinguishing that type of competency from

---

[108] *Id.* at B348.

45

competency to stand trial, and asked the court to "continue the case for one year."[109]

Cooke chimed in, asking the court to "grant me some more time on the case."[110]

Noting that "whether or not [Cooke] can be prepared [for trial] is one of the pitfalls of self-representation," the court said that it had "no intention . . . of continuing the trial of this matter."[111] The court granted Cooke's request that he be permitted to represent himself and appointed his counsel to serve as standby counsel. The court directed counsel to be prepared to resume their role as trial counsel should the need arise.

In its written order memorializing its November 30 bench ruling, the court clarified that Cooke's second-trial counsel of record were

> relieved of the duty to act in that capacity but shall act as "Standby Counsel" to be consulted by the Defendant on procedural, substantive or other matters related to the trial of the charges lodged against him in this matter should the Defendant choose to do so. Standby Counsel shall attempt to meet with Mr. Cooke as often as necessary to assist him in the preparation of his defense, but in any event, no less tha[n] three days per week.[112]

The order further required Cooke "to adhere to, follow and/or comply with all applicable rules, regulations, laws and other guidelines by which any attorney involved in representing a defendant charged with violations of the criminal laws of

---

[109] *Id.* at B358.
[110] *Id.* at B361.
[111] *Id.* at B359.
[112] Order Regarding Self-Representation and Assistance of Standby Counsel at 2, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Dec. 29, 2011).

this State would be governed . . . [and] conduct his interaction with the Court, counsel and staff with civility, without rancor or animosity."[113]  The order warned Cooke that his "failure to act appropriately in either regard may result in sanction by the Court up to and including forfeiture of the right of self-repres[e]ntation and assumption of the Defendant's defense by Standby Counsel."[114]

To facilitate Cooke's preparation for trial, he was transferred from James T. Vaughn Correctional Center to the Howard R. Young Correctional Institution, to be in closer proximity to his standby counsel.  The Superior Court ordered that Cooke's cell be of sufficient size as would allow him to maintain "a reasonable amount of materials, including legal research, to be used in connection with the preparation of his defense."[115]  The court further ordered that Cooke was to have "access to legal research and related materials" and "shall be allowed to maintain certain materials . . . in his cell."[116]  The court directed that sufficient space be allotted to allow Cooke and standby counsel to review research, evidence, and other materials relevant to the preparation of Cooke's defense.  Finally, the court ordered that Cooke have "access to the technology necessary to review evidence and/or materials preserved on DVDs, VHS cassettes and like mediums to prepare for trial."[117]

---

[113] *Id.* at 2–3.
[114] *Id.* at 3.
[115] Letter from Court Re: Defendant's Location and Conditions of Confinement, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Dec. 29, 2011) (D.I. 373).
[116] *Id.*
[117] *Id.*

When the trial court convened a status hearing in late January 2012, four topics dominated the discussion: a renewed request by Cooke that the trial be continued so that Cooke could complete his document review and consider retention of experts, Cooke's ability to represent himself, and the status of the pending motion to suppress Cooke's statements to police.[118]

Addressing Cooke's concern that he had been unable to retain the experts he needed, standby counsel disclosed that, in his opinion, the only expert testimony that he would seek to introduce would be from the State's experts, who had developed "exculpatory information that [the defense] would want to put in in case [the State] did not."[119] Cooke suggested that he might ratify the position but "need[ed] to research that."[120]

The focus of the hearing shifted briefly to the issue of Cooke's competency and ability to represent himself when standby counsel reported that Cooke "wanted to be sent down to the Delaware Psychiatric Center for an evaluation."[121] It is not clear from counsel's comments on this point whether he was referring to Cooke's competency to stand trial or the intelligence of his waiver of his right to counsel and

---

[118] During the hearing, Cooke's standby counsel also reported that the State had extended a plea offer under which the State would not seek the death penalty if Cooke pleaded "no contest" to the indictment. Cooke's response to the offer was unequivocal: "No, I do not wish to. The only thing I am looking for is a dismissal of the charges." Tr. of Status Hr'g at 25, *State v. Cooke*, Cr. ID. No. 0506005981 (N) (Del. Super. Ct. Jan. 27, 2012).

[119] *Id.* at 11.

[120] *Id.* at 12.

[121] *Id.* at 6.

his ability to represent himself effectively.  When the trial judge sought clarification from Cooke, Cooke stated, "I believe I am competent,"[122]—and the discussion moved on.

Toward the end of the status hearing, the State noted that the defense's motion to suppress Cooke's statements was still pending.  In an exchange with the trial judge, Cooke insinuated that he might not wish to press the motion, causing the trial judge to question whether Cooke was disavowing it.  Cooke removed all doubt in the following exchange:

> THE COURT:  . . . So, right now, I have a decision by you not to go forward on that motion.
>
> COOKE:  Right, because the motion wasn't in my behalf.[123]

The court denied Cooke's request for a continuance, but gave Cooke a week to file a motion to extend the deadline for the identification of experts and a motion to suppress evidence.  Although Cooke filed a flurry of motions the following week, he did not file a motion to suppress his statements to police.

G

Jury selection began on February 20, 2012, with Cooke in control of his own defense; it continued for eight days with Cooke exercising numerous peremptory challenges and challenging at least one of the State's peremptory challenges under

---

[122] *Id.* at 14.
[123] App. to Answering Br. at B368.

*Batson v. Kentucky*.[124]  The prosecution delivered its opening statement to the jury, hewing closely to the narrative it had presented to the jury in 2007.  In Cooke's opening statement, other than to profess his innocence and tell the jury that he knew Lindsey Bonistall before she was murdered, Cooke focused his remarks on the unfairness of the proceedings; in his telling, the case against him was beset by racism and unspecified "foul play"[125] on the part of the court and prosecution.

On the third day of trial after an extended colloquy in which Cooke sought to revisit the trial court's earlier rulings and cast aspersions on the trial judge, the court concluded that Cooke was unwilling to follow the previously set rules and guidelines governing Cooke's self-representation.  Accordingly, the court found that Cooke had forfeited the right to represent himself.  The court recessed for five days, giving standby counsel time to prepare to resume their representation of Cooke.

As with its opening statement, the State's case-in-chief proceeded much as it did in 2007.  Forty-one of the 55 witnesses who testified in 2007 testified again in 2012.  And though a careful eye might spot nuanced differences in some of the witnesses' testimony on the two occasions, those differences are immaterial to the claims in Cooke's postconviction relief motion.  Cheryl Harmon and Amalia Cuadra testified about the break-ins at their respective apartments.  And the investigating

---

[124] 476 U.S. 79 (1986).
[125] Trial Tr. 99, Mar. 7, 2012.

officers repeated the gruesome account of their discovery of Lindsey Bonistall's burnt body in the bathtub and the bizarre writings on her apartment wall. As in 2007, the testimony and physical evidence established that the three break-ins and related crimes were perpetrated by the same individual. And the same testimony and physical evidence presented in 2007—the handwriting, the hair, the DNA, and the identifications of both voice and visage—again pointed convincingly at Cooke.

By contrast—and, given our 2009 opinion reversing Cooke's 2007 conviction, of necessity—Cooke's defense in 2012 was much different than in 2007. In consultation with Cooke, Cooke's second-trial counsel constructed a defense strategy that could be squared with Cooke's claim of innocence. They summarized the strategy in an affidavit filed in this postconviction relief proceeding:

> The [d]efense at trial was that the Defendant was a paramour of the victim[;] however, someone else beat, hogtied, raped, murder[ed] her, and set fire to her apartment. In support of this defense, a Rule [sic] 3508[126] motion was filed to seek leeway in putting before the jury the victim's sexual endeavors, propensity and behavior. The motion was denied.
>
> The focus of this defense was the discovery of a University of Pennsylvania fraternity composite photograph found in the victim's apartment. The composite was heavily defaced with several photographs being scratch [sic] out. Additionally, a lone single yellow rose was found in the apartment suggesting a paramour visited the victim the night of her murder. The Defendant insisted on testifying

---

[126] 11 *Del. C.* § 3508(a)(1) sets forth the procedure for the court's consideration in rape prosecutions of "the relevancy of evidence of the sexual conduct of the complaining witness . . . ."

that he was involved in an ongoing sexual relationship with the victim.[127]

Cooke's testimony was the centerpiece of his defense. He first explained how he came into possession of Amalia Cuadra's backpack, telling the jury that, as he and Campbell were watching television, there was an automobile accident on his street. Cooke said that he went outside and saw officers questioning two young men who had apparently discarded the backpack. Cooke picked it up and returned to his house where he went through the backpack's contents. Campbell told Cooke to "get [the backpack] . . . out of her house"[128] so, according to Cooke, he "just threw it out."[129] Cooke flatly denied that he attempted to use Cuadra's ATM card.

Eventually, Cooke's testimony turned to his claim that he had a relationship with Lindsey Bonistall before she was murdered; Cooke claimed that he knew her "way before"[130] that, and that she had even been to his house twice. During direct examination, Cooke's counsel noted "the incident" involving Bonistall he wished to discuss occurred on "April 30th, into May 1st,"[131] a Saturday and Sunday, respectively. But when Cooke described the event, he said that "it was on that Friday."[132] Cooke testified that he arrived at Bonistall's apartment that night around

---

[127] App. to Answering Br. at B663–64.
[128] Trial Tr. 93, April 10, 2012.
[129] *Id.* at 94.
[130] *Id.* at 108.
[131] *Id.* at 109.
[132] *Id.* at 111.

10:45 and that a "young man" named Michael Skogen was there.[133]  Cooke said that he remained at Bonistall's apartment for "almost an hour,"[134] during which Skogen left.  After that, according to Cooke's testimony he and Bonistall smoked a blunt[135] and had sex, and then Cooke went home.  This, of course, stands in contrast to what Cooke told the police on the night of his arrest, when he insisted that he did not know Bonistall.  On the stand, Cooke attempted to explain the discrepancy as the product of intimidation by the police who Cooke believed were intent on setting him up.

On cross-examination, Cooke confirmed that his testimony on direct concerned his contact—the last he claimed to have had—was on Friday, between 10:45 and 11:45 p.m.; he said that he was "absolutely certain"[136] about this.  He claimed that Bonistall was drunk when he arrived and that she had told Cooke that she had been at a party at a friend's house.  Cooke stuck by his story even after being confronted with testimony and time-clock records indicating that Bonistall was at work until 11:28 p.m. that night.

---

[133] *Id.*  Skogen lived in the Towne Court apartment complex but not in Lindsey Bonistall's building.  In the State's case-in-chief, Skogen testified that he was in Bonistall's apartment for about ten minutes on the day preceding Bonistall's murder.  According to Skogen, Bonistall was planning to move onto the University of Delaware's campus, and he was considering moving into her apartment after the move.  When he was in Bonistall's apartment, she was the only other person present.  Skogen testified that he had never seen and did not know Cooke before the murder.

[134] *Id.* at 112.

[135] A "blunt" is "a cigar that has been hollowed out and filled with marijuana."  Blunt, Merriam-Webster, https://www.merriam-webster.com/dictionary/blunt (last visited Dec. 18, 2024).

[136] Trial Tr. at 131, April 10, 2012.

On redirect examination, Cooke denied that he had burglarized Cheryl Harmon's and Amalia Cuadra's apartments and that he had raped and murdered Lindsey Bonistall.

The jury found Cooke guilty on all charges except one charge of misdemeanor theft. At the conclusion of a penalty hearing lasting nine days, the jury recommended a sentence of death by votes of 10-2 as to intentional murder and 11-1 as to felony murder. The Superior Court sentenced Cooke to death on September 7, 2012, and he appealed to this Court.

## H

Cooke raised numerous claims in his direct appeal. Finding that Cooke's claims were "not organized in his briefs in any thematic way,"[137] we grouped the claims that raised common themes together as follows: (1) "claims that involve, in various forms, a contention that [Cooke] was denied the ability to effectively defend himself at trial,"[138] which included a claim predicated on the trial court's denial of his request for a continuance of his trial; (2) claims challenging the trial court's rulings on the admissibility of certain evidence; (3) his contention that "various issues relating to the jury's composition compromised his right to an impartial

---

[137] *Cooke v. State*, 97 A.3d 513, 524 (Del. 2014).
[138] *Id.*

54

jury;"[139] and (4) his contention—now moot—that his death sentence was disproportionate to the penalty imposed in similar cases. For our purposes here, it is sufficient to note that we rejected each of Cooke's claims and affirmed his convictions and sentences.

I

As we noted in our introduction, Cooke filed a timely motion for postconviction relief under Superior Court Criminal Rule 61 in March 2015. His motion was amended after new counsel was appointed to represent Cooke in the postconviction proceedings. And as also mentioned earlier, the amended motion and its exhibits are voluminous, spanning over 2,000 pages. The amended motion itself comprises 698 numbered paragraphs and purports to state fifteen separate claims for relief. After conducting an evidentiary hearing that consisted of 12 days of testimony from 22 witnesses and two days of oral argument, and after considering several thousand pages of exhibits, the Superior Court rejected each of Cooke's claims. We will discuss the bases of the Superior Court's rejection of Cooke's claims, as necessary, in the analysis section of this opinion. For now, we merely summarize the numerous purported flaws in the trial court proceedings leading to his convictions that Cooke contends warrant postconviction relief.

---

[139] *Id.*

Predominant among Cooke's claims is his attack on the effectiveness of his lawyers, especially as to their handling of issues related to Cooke's mental health. Despite his steadfast assertions of competency during his first direct appeal, Cooke now argues that he was so obviously incompetent to stand trial in 2012 and to waive his right to counsel and his right against self-incrimination that his lawyers' failure to press these issues—it should be said here, against Cooke's wishes—was objectively unreasonable and fatally prejudicial to his defense. For good measure, Cooke also takes the trial court to task for not *sua sponte* inquiring into his competency. Cooke challenges, too, the adequacy of his counsel's pretrial investigation as well as their failure to object or to appeal what he characterizes as "the State's peremptory race-and gender based strikes[]"[140] during jury selection— a process that unfolded while Cooke was in full command of his own defense. Cooke rounds out his appellate claims with two procedural arguments based on the trial court's refusal of Cooke's continuance request following his assumption of responsibility for his defense and the postconviction relief court's discovery limitations. Cooke adds a "cumulative prejudicial effect" argument under which he contends that "even if relief is not required on any [individual] error[,] it is required on the basis of the cumulative effect of these errors denying Cooke a fair trial."[141]

---

[140] Opening Br. at 57.
[141] *Id.* at 67.

## II

We begin our analysis by identifying the standard and scope of our review and certain procedural considerations that constrain our review of motions for postconviction relief under Superior Court Criminal Rule 61. We also preface our analysis of Cooke's claims of error with a brief discussion of the general principles applicable to his ineffective-assistance-of-counsel claims.

## A

In general, we review the Superior Court's denial of postconviction relief for abuse of discretion.[142] We will not disturb the factual findings of the Superior Court as long as they are based on competent evidence and not clearly erroneous.[143] When a motion for postconviction relief implicates "legal or constitutional questions, including ineffective-assistance-of-counsel claims," our review of its denial is *de novo*.[144]

---

[142] *Powell v. State*, 173 A.3d 1044, 1046 (Del. 2017).

[143] *Burrell v. State*, 953 A.2d 957, 960 (Del. 2008).

[144] *Green v. State*, 238 A.3d 160, 173 (Del. 2020). *See also Matthews v. State*, 319 A.3d 891, 903 (Del. 2024); *Starling v. State*, 130 A.3d 316, 325 (Del. 2015). We recognize that this Court has, on occasion, stated that ineffective-assistance-of-counsel claims are reviewed under an "abuse of discretion" standard. *See, e.g.*, *Sabb v. State*, 253 A.3d 536, 2021 WL 2229631, at *2 (Del. May 28, 2021) (TABLE); *Dennis v. State*, 106 A.3d 1049, 2015 WL 82673, at *2 (Del. Jan 6, 2015) (TABLE); *Gattis v. State*, 955 A.2d 1276, 1287 (Del. 2008). Under this standard, the scope of our review was to "carefully review the record to determine whether competent evidence supports the court's findings of fact and whether its conclusions of law are not erroneous." *Gattis*, 955 A.2d at 1287. By its own language, this standard calls for plenary review of legal and constitutional questions. Any tension in our caselaw concerning the standard of review, as we see it, arises from *Strickland*'s "fact-intensive, case-by-case analysis" of attorney performance. *Zebroski v. State*,

B

Before addressing the merits of a Rule 61 claim, we first determine whether it is procedurally barred under Superior Court Criminal Rule 61(i).[145] As the Superior Court correctly noted, only three of Rule 61(i)'s six subsections are "in play in this case."[146] Those subsections are 61(i)(3), (4), and (5). Rule 61(i)(3) and (4) are procedural bars. They read as follows:

> (3) *Procedural default*. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows
>   (A) Cause for relief from the procedural default and
>   (B) Prejudice from violation of the movant's rights.
> (4) *Former adjudication*. Any ground for relief that was formally adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred.[147]

Except under extraordinary circumstances, ineffective-assistance-of-counsel claims cannot be asserted in the proceedings leading to a judgment of conviction. For obvious reasons, they are not raised during trial, and our case law recognizes

---

822 A.2d 1038 (Del. 2003). Our analysis of *Strickland* claims necessitates deference to the Superior Court's factual findings but requires that we review its conclusions of law—such as the existence of a constitutional violation—*de novo*. Our cases have consistently and correctly evaluated ineffective-assistance-of-counsel claims in this manner.

[145] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990) (citing *Harris v. Reed*, 489 U.S. 255 (1989)).

[146] *State v. Cooke*, 2022 WL 17817903, at *7 (Del. Super. Ct. Dec. 15, 2022).

[147] Super. Ct. Crim. R. 61(i)(3)–(4).

that they are rarely susceptible to resolution on direct appeal.[148] Accordingly, as a general matter, the procedural bar of Rule 61(i)(3) does not apply to ineffective-assistance-of-counsel claims.

As amended in 2014, Rule 61(i)(5) provides that the bars set forth in Rule 61(i)(1)–(4) do not apply "to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or 2(ii) of subdivision (d) of this rule."[149]  To satisfy this standard and thus avoid an otherwise applicable procedural bar, the movant must "plead[] with particularity new evidence exists that creates a strong inferences that the movant was actually innocent in fact of the acts underlying the charges with which he was convicted" or that there exists a new rule of constitutional law that applies retroactively and would render the conviction at issue invalid.[150]

Despite their relevance and their citation by the State and the Superior Court in the proceedings below, Cooke did not meaningfully address the Rule 61(i) procedural bars in his opening brief.[151]  Only after the State argued in its answering brief that some of his claims were procedurally barred did Cooke address the issue

---

[148] *See Duross v. State*, 494 A.2d 1265, 1269 (Del. 1985) (noting that this Court cannot adequately consider an ineffective-assistance-of-counsel claim without a complete record concerning trial counsel's investigation and preparation for trial); *Ploof v. State*, 75 A.3d 811, 821 (Del. 2013) (noting that this Court generally declines to consider ineffective-assistance-of-counsel claims on direct appeal to allow the defendant to fully investigate the issue in postconviction proceedings)

[149] Super. Ct. Crim. R. 61(i)(5).

[150] Super. Ct. Crim. R. 61(d)(2).

[151] Cooke makes passing references to procedural bars in his discussion of two of his ineffective-assistance-of-counsel claims but avoids the subject when discussing claims that are not based on an ineffective-assistance claim.

in his reply brief. Relying on an outdated version of Rule 61(i)(5), Cooke argues that his claims are not barred because he has stated "a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity, or fairness of the proceedings leading to the judgment of conviction."[152] This "miscarriage of justice" exception could be found in Rule 61(i)(5) before its amendment on June 4, 2014, when it was removed.[153] Cooke argues that the application of Rule 61 as amended in 2014 to his case is an *ex post facto* law in violation of Article I, Section 7 of the United States Constitution. Cooke claims that, when any of his claims would otherwise be procedurally barred, we should apply the old Rule 61(i)(5) that includes the "miscarriage of justice" exception.

Cooke has waived this argument,[154] but we address it here for completeness. We have considered and rejected this argument before. In *Bailey v. State*, we held that "[t]he *ex post facto* clause . . . was not meant to restrict legislative or judicial control of remedies and modes of procedure that do not affect substantive rights."[155] For this reason, we held that purely procedural changes to criminal laws do not violate the constitutional ban against *ex post facto* criminal laws.[156] A change to a

---

[152] Reply Br. at 1–2 (quoting Super. Ct. Crim. R. 61(i)(5) (2013)).
[153] *See* Order Amending Super. Ct. Crim. R. 61 (June 4, 2014).
[154] *See* Supr. Ct. R. 14(b)(vi)(A)(3).
[155] *Bailey v. State*, 588 A.2d 1121, 1125 (Del. 1990).
[156] *Id.*

criminal law is procedural when it does not "affect either 'the crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish the defendant's guilt.'"[157]  We concluded in *Bailey* that the change from the old Superior Court Rule 35 to the then-new Rule 61 was procedural and did not violate the United States Constitution's prohibition of *ex post facto* criminal laws.[158]

Like the initial enactment of Rule 61, the June 2014 amendment to Rule 61 is also procedural because it does not "affect the extent of [a defendant's] punishment and the quantity or the degree of proof necessary to establish his guilt."[159]  Cooke's argument to the contrary is meritless.  We have consistently found that motions for postconviction relief filed after the enactment of the 2014 amendment to Rule 61 are governed by the amended rule.[160]  Cooke petitioned the Superior Court for postconviction relief in January 2015.  Because Cooke's petition was filed after the enactment of the amended rule,[161] the amended Rule 61(i)(5) applies to Cooke's claims.

---

[157] *Id.* (quoting *Dobbert v. Florida*, 432 U.S. 282, 294 (1977)) (brackets omitted).
[158] *Id.*
[159] *Id.*
[160] *See Cannon v. State*, 127 A.3d 1164, 1167 n.15 (Del. 2015); *Thomas v. State*, 228 A.3d 689, 2020 WL 1814047, at *1 (Del. Apr. 7, 2020) (TABLE); *Durham v. State*, 173 A.3d 1061, 2017 WL 5450746, at *2 (Del. Nov. 13, 2017) (TABLE); *Turnage v. State*, 127 A.3d 396, 2015 WL 6746644 (Del. Nov. 4 2015) (TABLE).
[161] Order Amending Super. Ct. Crim. R. 61 at 8 (June 4, 2014) ("This amendment shall be effective June 4, 2014 and shall apply to postconviction motions filed on or after that date.").

In our analysis, we determine whether Cooke's claims are procedurally barred as we discuss each claim.

C

To succeed on an ineffective assistance of counsel claim, a defendant must satisfy the settled standard established by the United States Supreme Court in *Strickland v. Washington*.[162] Cooke must first show that his "counsel's representation fell below an objective standard of reasonableness."[163] If he is successful there, he must then show that the deficiency was prejudicial to his defense.[164]

To prevail on the first part of the *Strickland* test—the performance prong—Cooke bears a heavy burden.[165] "Judicial scrutiny of counsel's performance [is] highly deferential."[166] Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[167] In his effort to rebut this strong presumption, Cooke bears the burden of persuasion.[168]

Proving that counsel's performance was objectively unreasonable "has nothing to do with what the best lawyers would have done . . . or even what most

---

[162] 466 U.S. 668 (1984).
[163] *Id.* at 687–88.
[164] *Id.* at 691–92.
[165] *Hoskins v. State*, 103 A.3d 724, 730 (Del. 2014).
[166] *Strickland*, 466 U.S. at 689.
[167] *Green*, 238 A.3d at 178.
[168] *Id.* at 173.

62

good lawyers would have done."[169]   "[A] lawyer's performance is only constitutionally deficient if no competent attorney would have chosen the challenged course of action."[170]  Where "an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options," the presumption that an attorney acted reasonably is "virtually unchallengeable."[171]  Cooke will not succeed merely by showing that his counsel could have conducted his defense more effectively.  To rebut *Strickland*'s presumption of reasonableness he must show that his counsel's performance was so deficient that they were no longer functioning as the "counsel" guaranteed by the Sixth Amendment.[172]

Even if Cooke is successful in showing that his counsel's actions were objectively unreasonable, *Strickland*'s second part—the prejudice prong—presents another arduous standard.  "To demonstrate prejudice caused by counsel's ineffectiveness, a defendant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[173]  Although less than a preponderance of the evidence, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.  That

---

[169] *Id.* at 178 (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)) (brackets omitted).

[170] *Id.* (citing *Premo v. Moore*, 562 U.S. 115, 124 (2011)).

[171] *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014) (quoting *Hoskins*, 102 A.3d at 730).

[172] *State v. Peters*, 283 A.3d 668, 686 (Del. Super. Ct. 2022), *aff'd*, 299 A.3d 1 (Del. 2023); *Strickland*, 466 U.S. at 687.

[173] *Starling*, 130 A.3d at 325  (quoting *Strickland*, 466 U.S at 694).

requires a 'substantial,' not just 'conceivable,' likelihood of a different result."[174] "We may dispose of an ineffective-assistance-of-counsel claim based on the absence of sufficient prejudice without addressing the performance prong if, in fact[,] prejudice is lacking."[175]

## III

## A

In his lead argument on appeal, Cooke contends that his second-trial counsel "were ineffective for failing to explore his competency [to stand trial], and the trial court erred in not doing so *sua sponte*."[176] Contradicting his protestations in the direct appeal of his 2007 conviction and before and during his 2012 trial, Cooke now contends that, had his second-trial counsel raised the issue, there was a reasonable probability that Cooke would have been found incompetent in 2012. He argues further that, given what he now sees as reasonable cause to believe that he was incompetent in 2012, the trial court violated his due process rights by failing to *sua sponte* evaluate his competency.

To the extent that Cooke's competency claim is grounded in the unreasonableness of his second-trial counsel's failure to press the issue in 2012, it is

---

[174] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). *See also Starling*, 130 A.3d at 325.
[175] *Green*, 238 A.3d at 174–175.
[176] Opening Br. at 2.

not subject to any of Rule 61(i)'s procedural bars. As mentioned above, this claim could not have been brought in the proceedings leading to Cooke's convictions or in the direct appeal of those convictions. But the same cannot be said of his argument that the trial court's failure to order a competency hearing *sua sponte* violated his due process rights. Absent a showing of cause and prejudice under Rule 61(i)(3)—a showing Cooke cannot make—postconviction relief based on Cooke's failure to challenge the trial court's action is procedurally barred.[177]

After the Superior Court reviewed the then-17-year record in this case and held a 12-day Rule 61 evidentiary hearing, it concluded that the evidence established that Cooke was competent to stand trial in 2012. This conclusion, if sustainable on appeal, thwarts Cooke's ineffective-assistance claim; if Cooke was competent, there could be no prejudice from his lawyers' failure to explore his competency. But for the sake of completeness and in fairness to Cooke's second-trial counsel, we forgo this shortcut to affirmance and address the objective reasonableness of counsel's decision. But first some level-setting.

The longstanding test of competency to stand trial is "whether or not the defendant has sufficient present ability to consult with his lawyer rationally and whether he has a rational as well as a factual understanding of the proceedings

---

[177] In his briefing, Cooke so intermingles his ineffective-assistance and due-process arguments as to his competency that our resolution of his ineffective-assistance claim would, as a practical matter, defeat the substance of his due-process claim.

against him."[178]  In an opinion cited approvingly by this Court, our Superior Court has observed that "the competency threshold is quite low.  It is neither very demanding nor exacting.  The standard by which a defendant's competency is measured is not that of the reasonable person but rather of the average criminal defendant."[179]

Due process requires that a defendant be competent to stand trial, and our criminal code recognizes that the accused who is not competent should not stand trial.[180]  Under 11 *Del. C.* § 404(a),

> [w]henever the court is satisfied, after hearing, that an accused person, because of mental illness or serious mental disorder, is unable to understand the nature of the proceedings against the accused, or to give evidence in the accused's own defense or to instruct counsel on the accused's own behalf, the court may order the accused person to be confined and treated in the Delaware Psychiatric Center until the accused person is capable of standing trial.

In his motion, Cooke asserts that "Cooke's mental illness, and resultant behaviors and cognitive deficits were (or should have been) readily apparent to counsel from the moment they assumed representation in his case."[181]  Consequently, according to Cooke, "counsel's failure to consult with a mental health expert or request a competency hearing . . . constituted ineffective assistance in

---

[178] *Williams v. State*, 378 A.2d 117, 119 (Del. 1977).
[179] *Tucker v. State*, 105 A.3d 990, 2014 WL 7009954, at *2 (Del. 2014) (TABLE) (quoting *State v. Shields*, 593 A.2d 986, 1012–13 (Del. Super. Ct. 1990)).
[180] *Pate v. Robinson*, 383 U.S. 375, 378 (1966).
[181] App. to Opening Br. at A714.

violation of [Cooke's] constitutional rights."[182] As mentioned, Cooke must demonstrate that counsel's decisions regarding Cooke's competency were objectively unreasonable and that, had counsel proceeded differently, it is reasonably probable that the trial court would have declared him incompetent.

In his briefing, Cooke's discussion of the reasonableness of his second-trial counsel's decision to forgo a competency challenge is thin. His argument is centered primarily on (i) an evaluation by Dr. Bhushan Aghakar, a psychiatrist who met with Cooke twice in 2019 and (ii) an assertion that the Superior Court erroneously "concluded [that] counsel's fear that '[if] they attempted anything with mental health[,] he would fire them,' was a reasonable basis not to ensure their client's competence."[183] The latter charge—that the court's reasonableness conclusion was

---

[182] *Id.* We note that Cooke's amended motion for postconviction relief alleges that his second-trial counsel "failed in their duty to ensure . . . . [that Cooke] was capable of knowingly and intelligently waiving his right[] to counsel . . . ." App. to Opening Br. at A713. We also note that the Superior Court's opinion denying postconviction relief contains a discussion entitled "Competency and the Defendant's Self-Representation." *Cooke*, 2022 WL 17817903, at *26–27. Likewise, the State's answering brief includes a section entitled "Competency for Self-Representation." Answering Br. at 30–33. But Cooke does not argue in the body of his opening brief that his second-trial counsel were ineffective for not flagging the competency issue when Cooke requested leave to represent himself. Leaving aside the distinction between competency and the intellectual wherewithal to conduct a defense in a complicated capital murder case, we assume that Cooke's decision to forgo this claim was based on his recognition that his counsel did in fact raise the issue when the court was considering Cooke's self-representation. *See* App. to Answering Br. at B347.

[183] Opening Br. at 27.

67

tied to counsel's fear of being "fired"—mischaracterizes the court's findings; nowhere in the Superior Court's 245-page opinion can such a conclusion be found.[184]

To be sure, after an extensive records review and two meetings with Cooke, Dr. Agharkar authored a 15-page report questioning Cooke's competency to stand trial. He ended his report with a summary of his conclusions.

> As a result of his Delusional Disorder and organic brain impairments, it is my opinion to a reasonable degree of medical certainty, that the symptoms exhibited by Mr. Cooke negatively impacted his competency at the time of his trial. Due to the lack of a psychiatric evaluation for competency to stand trial around the time of this trial, I am unfortunately constrained by this lack of information. In my opinion, the persecutory delusions and his impairments in reading social cues and rationally weighing and deliberating options likely would have rendered him incompetent to stand trial, waive counsel and represent himself at the time of the trial, as well as rationally comprehend the proceedings against him and the court's instructions. It is very unlikely he would have been able to rationally assist counsel. His custodial interviews and polygraph examination demonstrate how he misunderstands and misconstrues a great deal. Due to his major mental illness and brain impairments, Mr. Cooke appears to have misinterpreted his relationship with the alleged victim as no objective evidence supports his assertions they had a history together.[185]

Cooke also makes the claim that his 2007 counsel testified at the Rule 61 evidentiary hearing in 2021 that Cooke was incompetent in 2007. This too mischaracterizes the record. When one of Cooke's lawyers was asked about Cooke's "multiple outbursts" during the 2007 trial, he responded, "The conduct over

---

[184] The court acknowledged that counsel was aware that "[i]f they attempted anything with mental health[,] [Cooke] would fire them." *Cooke*, 2022 WL 17817903, at *19. This is different than saying counsel's fear of being fired justified their decision not to seek a competency evaluation.
[185] App. to Opening Br. at A2659–60.

68

the course of time[,] looking back at it now, . . . . maybe we should have had him looked at for competency during the pendency of the trial, but we didn't."[186] And when Cooke's other 2007 counsel addressed the topic, it was in the context of a hypothetical: whether, if Cooke had requested to proceed *pro se* in 2007, counsel would have requested a competency determination. Counsel responded: "That's a hard question. Looking back, you know, hindsight being 20/20, that would have been the smart thing to do. That would have been the legally appropriate thing to do as a defense attorney."[187] But Dr. Agharkar's 2019 conclusions and Cooke's 2007 counsel's musings in 2021 are at best of marginal utility as we assess the objective reasonableness of Cooke's second-trial counsel's performance in 2012. In this inquiry, we must focus on what second-trial counsel knew before Cooke's trial began in February 2012.

We do not mean to suggest that, as they prepared to defend Cooke at his 2012 trial, Cooke's counsel were unaware of their predecessors' concerns regarding Cooke's competency; they most certainly were. Nor could they ignore the findings and conclusions of Drs. Turner and Bernstein and the myriad other mental health professionals who chronicled Cooke's cognitive and psychiatric disorders and their etiology. And we should not discount the significance of Cooke's previous

---

[186] *Id.* at 991.
[187] *Id.* at 1031.

counsel's initiation of Dr. Eichel's competency evaluation—cut short by Cooke's decision to sue his lawyers and experts—in 2010. Admittedly, these facts would have militated in favor of a competency evaluation in 2012. But they only tell part of the story.

For starters, Cooke's focus on the evidence tending to show that he was mentally ill ignores the fact that mental illness and legal incompetency are distinct concepts in criminal law.[188] Cooke does not address this distinction.

Cooke also neglects to address the myriad other facts, undoubtedly front of second-trial counsel's mind, that would justify a decision not to pursue the competency issue. First and foremost here is Cooke's statement in his opening brief on direct appeal in 2008, when he challenged his lawyers bid for a GBMI verdict in his first trial: "Three mental health experts reached the conclusion that Cooke was competent[,] and the trial court so found. . . . As a competent individual, it was Cooke's individual and fundamental constitutional right to elect what plea to

---

[188] *See Mills v. State*, 256 A.2d 752, 756 (Del. 1969) (There is a "difference between the mental illness which precludes responsibility for crime and the mental illness which precludes trial. . . . It is conceivable, of course, that a defendant's mental illness is of such type and nature to make him unaccountable in the eyes of the law for the crime charged, and yet he may be quite capable mentally to understand the nature of the charges against him and to assist in his own defense."); *United States v. Noble*, 42 F.4th 346, 353–54 (3d Cir. 2022) ("But mental illness does not, on its own, mean that a defendant is not competent to stand trial.").

enter."[189]  And as we mentioned above, this Court accepted that representation and reversed Cooke's 2007 convictions.

In addition to these signposts, Cooke's second-trial counsel were confronted with Cooke's insistence on his competency and his obstinate refusal to cooperate with mental health professionals.  On top of that, Cooke's second-trial counsel "did not have any difficulty communicating with [Cooke] about trial strategy and potential defenses[,]"[190] one of the critical hallmarks of legal competency.  When Cooke's second-trial counsel viewed all these facts against the backdrop of our 2009 decision reproving Cooke's first-trial counsel for not respecting Cooke's autonomy over the basic decisions affecting his case, it was objectively reasonable for them to conclude that a competency evaluation would not serve Cooke's best interests.

Having concluded that counsel's decision was objectively reasonable, we could end our analysis of this issue here.  But we find it worth noting that the Superior Court's rejection of this claim was based on its careful review of a wealth of evidence regarding Cooke's mental status at the relevant times and its conclusion

---

[189] *See supra* note 74.  When confronted with these statements at oral argument, Cooke's current counsel suggested that Cooke's competency in 2007 or 2009 was not relevant to his competency in 2012.  There is no evidence, however, that Cooke's mental capacity degenerated between 2007 and 2012.

[190] App. to Answering Br. at B662.

that Cooke was in fact competent to stand trial. This conclusion, if supported by the record,[191] means that Cooke has not satisfied *Strickland*'s "prejudice" prong."

The Superior Court's determination in this postconviction relief proceeding that Cooke was competent to stand trial was based on its review of 670 pages of pleadings and briefing, "thousands of pages"[192] of reports and articles, and the record of Cooke's two trials. After considering the findings of the six mental health professionals retained by the defense, three of whom testified at Cooke's first trial and during the Rule 61 evidentiary hearing, and the Rule 61 evidentiary hearing testimony of three experts called by Cooke, including Dr. Agharkar, the court found that Cooke was competent. Cooke now challenges this finding, arguing that the Superior Court applied the incorrect legal standard and made unsupported factual findings when it performed its competency analysis. We disagree.

Cooke argues that, by citing *State v. Shields* for the proposition that "the competency threshold is quite low [and] . . . is neither very demanding nor

---

[191] When a trial court rules on a defendant's competency to stand trial in the first instance, if its finding is supported by the evidence, such finding is entitled to deference. *See Bailey v. State*, 490 A.2d 158, 167 (Del. 1983); *see also Diaz v State*, 508 A.2d 861, 864 (Del. 1986) (reviewing competency ruling to determine whether there is sufficient evidence on the record from which the trial court could find by a preponderance of the evidence that the defendant was competent. *But see Gibson v. State*, 981 A.2d 554, 557 (Del. 2009) ("We review a trial judge's competency determination *de novo*, to determine whether the State has established Gibson's competency by a preponderance of the evidence. We will defer to the trial judge's findings, when the record supports them.") (footnotes omitted). We harmonize these statements of the standard of review by noting that a competency determination involves both legal and factual components. We will review the legal standard applied by the trial court, *de novo*, but its factual findings, if supported by the record, are entitled to deference.

[192] *Cooke*, 2022 WL 17817903, at *1.

exacting,"[193] the Superior Court was unfaithful to *Strickland*'s prejudice standard. For Cooke, the citation of *Shields* signaled that the court applied a "preponderance of the evidence" standard of proof instead of *Strickland*'s "reasonable probability of a different result" standard.

Cooke's logical leap does not withstand scrutiny. Nowhere in its 245-page opinion does the Superior Court suggest that it was applying a "preponderance of the evidence" standard. By contrast, it specifically—and accurately—recites the correct prejudice standard under *Strickland*.[194] But even if the court had referred to the preponderance standard, Cooke's argument would still fail. That is because the determination whether, but for a performance deficiency, it is reasonably probable that the result of the proceeding would have been different appropriately must take into account the respective burdens of proof in that proceeding.

As we see it, the gravamen of Cooke's competency argument is not this standard-of-proof issue; rather, at its core, Cooke's claim is that the Superior Court's factual findings are "unsupportable"[195] and "improperly ignored"[196] the expert opinions with which he agrees. Cooke is incorrect on both scores.

---

[193] *Id.*, at *25 (citing *Shields*, 539 A.2d at 1012–13).
[194] *Id.* at *9.
[195] Opening Br. at 33.
[196] *Id.* at 34.

Cooke misconstrues the Superior Court's favoring of one expert's opinion over the opinion of another expert as evidence that the latter expert has been "ignored." Here, the expert whom Cooke says was ignored was Dr. Eichel. But a review of the Superior Court's opinion shows that the court considered Dr. Eichel's evaluation of Cooke, which we should recall was aborted when Cooke sued him. That the court found Dr. Mechanick's opinion more persuasive than Dr. Eichel's or Dr. Agharkar's—the only expert opining that Cooke was "likely" incompetent— does not mean that he ignored Dr. Eichel's and Dr. Agharkar's opinions.

To the contrary, the Superior Court listened intently to what Dr. Agharkar had to say, and the court's opinion reflects careful consideration of his report and testimony. The court noted Dr. Agharkar's disagreement with the mental health experts whom Cooke's counsel called during the first trial to opine that Cooke had a longstanding schizotypal personality disorder. The court acknowledged that Dr. Agharkar's conclusion that, because of brain damage or dysfunction in the frontal lobe of Cooke's brain, Cooke suffers from "delusionary disorder, persecutory type."[197] And the court quoted in full Dr. Aghakar's opinions as to Cooke's competency. But the court also pointed to aspects of Dr. Aghakar's testimony tending to show that Cooke was competent, including testimony touching upon

---

[197] *Cooke*, 2022 WL 17817903, at *21.

74

Cooke's apparent grasp of trial procedure and the roles played by the judge, jury, prosecutor, and defense counsel as well as Cooke's manipulative tendencies.

The court ultimately found Dr. Mechanick's opinion to be more persuasive than Dr. Agharkar's. Disagreeing with Dr. Agharkar, Dr. Mechanick testified, consistently with his 2007 testimony, that Cooke had an antisocial personality disorder that did not impair his competence to stand trial or, for that matter his ability to represent himself at trial.

Using a competency assessment tool known as the McGarry questions,[198] Dr. Mechanick reported (as quoted by the Superior Court)

- Cooke appreciated legal defenses and understood them; he wanted only innocence
- Cooke's behavior in Court was sometimes inappropriate but he could behave when he wanted
- Cooke was totally focused on a not guilty verdict
- Cooke could get along with his attorneys, but there were differences about what evidence could be presented and how. The differences were not because he was mentally ill. Dr. Mechanick testified that Cooke engaged and communicated with him so he was capable of doing likewise with his attorneys
- Cooke was able to plan a legal strategy though it was not effective in light of the evidence
- Cooke understood court procedure. He knew the players and their roles. He simply chose to disregard court procedures and rulings when it suited him
- He understood the charges and penalties if convicted
- Because of his personality, Cooke had an exaggerated sense of his ability to prevail, which was somewhat fed by prevailing in the reversal of his first conviction

---

[198] Dr. Mechanick described this methodology as "a way of breaking down various aspects of competency to stand trial[.]" App. to Answering Br. at 891.

75

- Dr. Mechanick was of the opinion that some of Cooke's outbursts in Court were due to concern about losing
- Cooke was able to disclose facts of his innocence even if these facts may be considered inaccurate because his goal was to be found not guilty
- Cooke was not always effective but he could challenge state witnesses (Dr. Mechanick read the transcripts of both trials)
- Cooke was able to testify relevantly about his innocence[199]

The court did not confine its competency inquiry to "the conflicting opinions of the doctors and other mental health evidence, but also [considered] how Cooke conducted himself in the majority of the court proceedings."[200] The court concluded:

> Mr. Cooke was fully competent from day one to be tried for murder and his other crimes. Mr. Cooke was fully competent to represent himself as was his right. When he wanted something, he communicated articulately and civilly. When a ruling was going against him, he behaved badly and threw a tantrum. He did not throw a tantrum because he was incompetent, but because he had lost control.[201]

This finding, amply supported in the two-decades long record—and fully aligned with Cooke's statement to this Court in 2008 when he sought and obtained reversal of his 2007 convictions—is entitled to our deference. And it suffices to support the Superior Court's conclusion that Cooke suffered no prejudice as a consequence of his second-trial counsel's decision to forgo a competency

---

[199] *Cooke*, 2022 WL 17817903, at *24.
[200] *Id.* at *25.
[201] *Id.* at *26.

evaluation.[202]   Hence, Cooke's principal ineffective-assistance-of-counsel claim founders on both of *Strickland* prongs.

B

Having reviewed Cooke's claims that are grounded in his claims of diminished mental capacity and finding them wanting, we turn next to Cooke's contention that his second-trial counsel were ineffective "for failing to reasonably investigate [his] case before making critical 'strategic' discussions."[203]   Like Cooke's previously discussed ineffective-assistance claim, this claim is not procedurally barred.

*Strickland* imposes a duty upon counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[204] A reasonable investigation does not require counsel to leave no stone unturned.[205] "The relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."[206]  An "inquiry into counsel's conversations with the defendant may be

---

[202] Because Cooke's ineffective-assistance-of-counsel claim based on his second-trial counsel's failure to explore Cooke's competency to stand trial has failed under both *Strickland* prongs. Cooke can show neither cause nor prejudice under Rule 61(i)(3) for not asserting his due-process claim in the proceedings leading to the judgment of conviction.  In consequence, that claim is procedurally barred.

[203] Opening Br. at 43.

[204] *Strickland*, 466 U.S. at 691.

[205] *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996)..

[206] *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

critical to a proper assessment of counsel's investigation decisions."[207]   And a defendant cannot claim that his counsel acted unreasonably when he has clearly prescribed the parameters of his defense and counsel makes reasonable decisions within those parameters.[208]

Under *Strickland*'s prejudice prong, a defendant must make "a comprehensive showing as to what the investigation would have produced."[209] The focus of our inquiry "must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result . . . ."[210]

Understanding the parameters that Cooke provided his counsel is critical in evaluating the reasonableness of second-trial counsel's investigatory decisions. Cooke—competent to stand trial and represent himself—insisted that his counsel pursue an innocence defense.[211]  As part of this defense, Cooke was adamant that he would testify at trial.  He told his counsel that he intended to testify, that he was engaged in an ongoing sexual relationship with Bonistall, and that the day before her murder, between 10:45 p.m. and 11:45 p.m., they had consensual sex.[212]  Cooke's

---

[207] *Strickland*, 466 U.S. at 691.
[208] *See Shelton v. State*, 744 A.2d 475, 504 (Del. 1999);  *Taylor v. State*, 32 A.3d 374, 383–84 (Del. 2011).
[209] *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996).
[210] *Id.*
[211] App. to Answering Br. at B662.
[212] *Id.* at B662, B1126.

testimony that he had engaged in consensual sex with Bonistall that Friday night would explain the presence of Cooke's DNA in Bonistall's vagina and under her fingernails. Defense counsel tried to impress upon Cooke that this was a poor strategy. They were concerned that the "mountain of evidence" that could be used to impeach Cooke would "open the floodgates" if he chose to testify.[213] Cooke did not change his mind. When asked at Cooke's Rule 61 hearing if he believed that second-trial counsel could have done anything differently to convince Cooke to change his mind about testifying, one of Cooke's lawyers answered, "No."[214]

In Cooke's first direct appeal, we held that, although a decision to testify is "indeed [a] strategic choice[] that counsel might be better able to make[,]" it is a "fundamental decision" reserved for the defendant alone.[215] Once a defendant has made a decision to testify, "counsel cannot undermine the defendant's right to make [that] personal and fundamental decision[] by ignoring the defendant's choice."[216] Second-trial counsel could not ignore our guidance.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

---

[213] *Id.*
[214] *Id.* at B1044.
[215] *Cooke*, 977 A.2d at 842.
[216] *Id.*

perspective at the time."[217]  Heeding this guidance from the United States Supreme Court, we conduct our analysis of the alleged investigatory failures of Cooke's second-trial counsel in the shadow of our opinion in Cooke's first direct appeal and Cooke's decision to assert his right to testify in his own defense in his second trial.

1

Cooke first claims that his counsel were ineffective by deciding to defend Cooke based on his innocent explanation of the State's DNA evidence without first investigating the reliability of such evidence.[218]  Under Cooke's view of events, counsel "decided their defense theory, then rejected an investigation that did not fit that decision."[219]  In its Rule 61 opinion, the Superior Court found that the decision by Cooke's counsel not to investigate the DNA evidence was reasonable because Cooke was "emphatic [that] he was going to testify to consensual sex."[220]  In finding that this decision was reasonable, Cooke claims that the Superior Court "improperly elevate[d] [Cooke's] preferences above counsel's ethical and professional duties."[221]

Tellingly, Cooke's argument makes no reference to our opinion in his first direct appeal.  It was part of second-trial counsel's "ethical and professional dut[y]" to respect Cooke's fundamental decisions concerning his case.  In keeping with this

---

[217] *Strickland*, 466 U.S. at 689.
[218] Opening Br. at 45.
[219] *Id.*
[220] *Cooke*, 2022 WL 17817903, at *65.
[221] Opening Br. at 46.

duty, counsel operated within the parameters set by Cooke. This meant preparing an innocence defense that would be compatible with the testimony that Cooke planned to give in his second trial. Given that second-trial counsel knew that Cooke would testify that he had consensual sex with Bonistall the day before the murder as part of their trial strategy, there was no reason to undertake an investigation to undermine the State's DNA evidence. Put another way, because rebutting the State's DNA evidence was unnecessary to their trial strategy given Cooke's fundamental decision to testify, counsel's choice not to investigate the State's DNA evidence was not objectively unreasonable.

Even if Cooke could show that a decision not to investigate the DNA evidence was unreasonable, Cooke fails to clear *Strickland*'s prejudice hurdle. The evidence showed that the DNA found in Bonistall's vagina and under her fingernails was almost certainly Cooke's. As mentioned above, the probability of randomly selecting an unrelated African American individual with a DNA profile matching the sperm fractions uncovered by the vaginal swab was one in 676 quintillion. And the probability of randomly selecting an unrelated African American individual with a DNA profile matching the sample taken from under Bonistall's fingernails was one in 1.64 billion. Cooke claims that a reasonable investigation would have uncovered a lab error that could have rendered this critical evidence inadmissible. The record does not support this claim.

81

Cooke's expert at the Rule 61 evidentiary hearing, Dr. Krane, opined that there was an increased likelihood that these results were erroneous because there was a possibility of a "sample switch" or injection error in the testing of each sample. Before the DNA panel that returned the results relied on at trial, an earlier panel produced a full DNA profile on what should have been a negative control sample. Krane testified that this error led him to believe that there could be other errors that undermined the reliability of the State's DNA evidence. But when pressed on this opinion by the Rule 61 judge, Krane agreed that this testimony was "only speculation."[222] Krane also conceded that, after the Office of the Chief Medical Examiner realized that a negative control had returned a full profile, the error was documented and the analysis of each DNA sample was "re-prepped."[223] Nothing in Krane's report or testimony suggests that the State's DNA evidence was unreliable to the point that it was inadmissible. Although the error identified by Krane might have been useful to defense counsel during cross-examination, it does not so undermine the credibility of the DNA evidence that there is a reasonable likelihood that there would have been a different outcome at trial. Cooke has failed to show prejudice.

---

[222] App. to Opening Br. at A2771.
[223] *Id.*

Nested in this section of his "duty to investigate" claims is Cooke's contention that his second-trial counsel were also ineffective because they failed to "reasonably prepare" for Cooke's innocent explanation of the DNA evidence.[224] Cooke claims that counsel were ineffective because they did not inform him of the "impossibility of his planned testimony."[225] Cooke told his counsel that he planned to testify that he had been with Bonistall on Friday evening—the day before the murder—between 10:45 p.m. and 11:45 p.m. But evidence available to counsel showed that Bonistall was not home that evening; as mentioned, she was at work. If counsel had informed him of this evidence, Cooke claims, he might have testified differently. This evidence, Cooke argues, would have "refreshed his recollection[,]"[226] and reminded him that he actually saw Bonistall on Saturday night.

The Superior Court found that this ineffective-assistance-of-counsel claim failed to satisfy Cooke's burden under *Strickland*'s prejudice prong because Cooke's testimony would have been "taken [] apart" on cross-examination regardless of whether Cooke testified that he was with Bonistall on Friday or on Saturday.[227] We agree with the Superior Court's conclusion concerning prejudice and add that

---

[224] Opening Br. at 45.
[225] *Id.*
[226] *Id.*
[227] *Cooke*, 2022 WL 17817903, at *46.

Cooke's counsel were objectively reasonable in making an effort to inform him of the damage that his proposed testimony could do to his case.

Certainly, counsel "has the professional duty [] to advise his client of the benefits and pitfalls of a decision to take the stand on his own behalf."[228] But the record does not support Cooke's version of events. In fact, it shows the opposite. Counsel informed Cooke on multiple occasions that he should not testify. Included in these warnings was the advice that the facts he planned to testify to were plainly inconsistent with the other evidence that would be introduced at trial, leaving Cooke vulnerable to cross-examination. At Cooke's Rule 61 evidentiary hearing, his second-trial counsel testified that he informed Cooke that numerous witnesses saw Bonistall at work on Friday night and that her timecard was punched at the same time Cooke claims to have been with her. Cooke "was listening" to this advice, but "didn't care" about the challenge that this evidence presented to his planned testimony.[229]

The focus of our analysis is not what information the best attorneys would have provided to Cooke. We need only determine whether the actions of Cooke's counsel were objectively reasonable. They were. Counsel informed Cooke that his decision to testify could harm his defense. They also informed Cooke of the

---

[228] *Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997).
[229] App. to Answering Br. at B1118–19.

84

inconsistencies in his planned testimony that would certainly be exposed on cross-examination. And in his briefing, Cooke avoids any mention of the most pointed advice provided by his defense counsel—that he should not testify at all. Despite this considered advice, Cooke chose to testify that he was with Bonistall on Friday night.

Even if second-trial counsel had acted unreasonably in advising Cooke concerning his testimony, Cooke cannot show prejudice. Against his counsel's advice—as was his right—Cooke testified that he was with Bonistall on Friday night between 10:45 p.m. and 11:45 p.m. Predictably, his credibility crumbled on cross-examination. The State asked Cooke about evidence already established at trial showing that Cooke told police in his June 7, 2005 statement that he did not know Bonistall, that Bonistall clocked out of work at 11:28pm on Friday, and that Bonistall made seven phone calls between 11:27 p.m. and 11:40 p.m. that night.

Had Cooke's counsel been successful in "refreshing Cooke's recollection" such that he would testify that he saw Bonistall on Saturday between 10:45 p.m. and 11:45 p.m., Cooke fails to show a substantial likelihood that the outcome at trial would not have been the same. The State could have cross-examined Cooke with evidence that Cooke told police on June 7 that he did not know Bonistall and that he was at home that Saturday at 11:00 p.m. Cooke also told police that another individual, Michael Skogen, was at Bonistall's apartment when he arrived there.

Skogen testified that he was not at Bonistall's apartment that night and that he did not know Cooke. And piecing together the evidence concerning Bonistall's whereabouts on Saturday night reveals only a slim, 30-minute window in which Bonistall was home before leaving to watch Saturday Night Live with her friends. In sum, Cooke's credibility would have been similarly undermined on cross-examination. Moreover, it is far from clear that Cooke's counsel had any hope of convincing Cooke that his "recollection" was wrong. Cooke falls far short of proving that he was prejudiced by his counsel's allegedly deficient advice concerning his testimony.

2

Cooke's remaining "duty to investigate" claims concern a purported failure to investigate non-DNA evidence. He claims that his second-trial counsel were ineffective for failing to conduct a reasonable investigation that would have discovered impeachment material for two key witnesses: Rochelle Campbell and Amalia Cuadra. Campbell's and Cuadra's testimony was integral to the State's case. As discussed above, Campbell identified Cooke as the individual using Cuadra's ATM card in the surveillance video from the JP Morgan branch and identified Cooke's voice in the recordings of the 911 calls. Similarly, Cuadra identified Cooke from the JP Morgan surveillance video as the man she saw in her bedroom.

86

Cooke claims that his counsel were ineffective because they failed to conduct a reasonable investigation of Campbell's contacts with police and, specifically, the extent to which the police employed coercive tactics during the investigation into the Bonistall murder. The Superior Court found that Cooke's counsel had conducted a reasonable investigation into the possibility that Campbell's testimony was the product of police coercion. In evaluating prejudice, the Superior Court found that there was no reasonable probability of a different outcome because, regardless of whether further investigation was conducted, as a result of Cooke's counsel's efforts, the jury was informed of Campbell's contacts with police and any discrepancies between her statements. We agree.

Second-trial counsel already had extensive knowledge that police aggressively questioned Campbell. Counsel also knew that, before any extensive contact with police, Campbell had provided an exculpatory statement in her initial interview—that Cooke was home all night on the night of the murder. An investigator interviewed Campbell before the 2012 trial, and counsel had access to records of an earlier interview conducted in advance of the 2007 trial. Cooke's counsel also possessed a letter from Campbell in which she apologized to Cooke for providing inculpatory evidence after being "hounded" by police and told that she "was going to jail."[230] The contents of these interviews and the letter showed

---

[230] App. to Opening Br. at A947–50.

87

second-trial counsel that, as police pressure on Campbell intensified, she began to provide statements that inculpated Cooke and were inconsistent with her initial interview. The impeachment evidence available to Cooke's counsel as a result of their own investigation and access to records from Cooke's first trial was extensive, and they had no duty to investigate all possible evidence that could have impeached Campbell.[231] In our view, the scope of counsel's investigation of the circumstances surrounding Campbell's questioning was objectively reasonable.

Cooke also cannot show prejudice. Cooke claims that counsel could have sought "further discovery about [Campbell's] contacts with police" and "confirm[ed] whether [Campbell] wrote the letter."[232] But Cooke fails to explain what information further investigation into Campbell's contacts with police would have produced. Additionally, obtaining confirmation that Campbell wrote the letter would have been cumulative of the information already known to Cooke's trial counsel and raised during the cross-examination of Campbell. Nor does Cooke's new expert, Dr. Davis, provide any new insight concerning the effect of coercive police tactics that was not already raised by second-trial counsel on cross-examination. Even if the investigation into Campbell's interactions with police that

---

[231] *See Alston v. State*, 125 A.3d 676, 2015 WL 5297709, at *3 (Del. Sep. 4, 2015) (TABLE).
[232] Opening Br. at 48.

88

Cooke now claims is necessary had been conducted, there is no substantial likelihood of a different outcome at trial.

Cooke appends to this claim an assertion that the failure to present "*all* evidence to impeach Campbell's inculpatory testimony and to present her exculpatory statement" on cross-examination was unreasonable.[233]  But how counsel chooses to conduct a cross-examination is a tactical decision.[234]  And after counsel's thorough investigation of Campbell, this strategic choice is "virtually unchallengeable."[235]  Moreover, prejudice is lacking.  Counsel ably cross-examined Campbell concerning the exculpatory statement she made in her initial interview and were able to discuss in detail the threats and coercive tactics levied against Campbell by police during their investigation before her testimony changed to inculpate Cooke.  Any additional impeachment evidence, such as introducing the letter, would have been cumulative with, at best, a marginal effect on Campbell's credibility and the ultimate outcome at trial.

We turn next to Amalia Cuadra's testimony.  During the police investigation, Cuadra was shown a photo lineup that included an image of Cooke and was asked to identify the man she saw in her room.  At Cooke's 2007 trial, Cuadra testified that her "instinct" was to select the picture of Cooke, but that she "second-guessed"

---

[233] *Id.*

[234] *Outten v. State*, 720 A.2d 547, 557 (Del. 1998).

[235] *Green*, 238 A.3d at 174.

herself and ultimately selected a different individual.[236]  Cuadra added that she was then informed that the picture she did not select was a picture of Cooke.  Because Cooke's first-trial counsel were pursuing a guilty but mentally ill defense, in Cooke's first trial there was no cross-examination of Cuadra's testimony or further discussion of the fact that she had been told by police that she had failed to identify Cooke.

When she testified in 2012, Cuadra recounted the same narrative about her initial misidentification.  Cuadra added that police then told her that her selection of a photograph was "incorrect" and identified to her the image of Cooke.[237]  At this point, the trial judge requested a sidebar conference.  During the sidebar, the trial judge expressed concern that having Cuadra make an in-court identification of Cooke would be improper given that police had identified Cooke to Cuadra during the photo lineup.  Cooke's counsel objected to any potential in-court identification by Cuadra, and the State agreed that they would not ask Cuadra to do so.

Given that second-trial counsel knew from Cuadra's 2007 testimony that she would testify about her failure to identify Cooke in the photo lineup, Cooke claims that his counsel were ineffective for not investigating "Cuadra's non-identification of Cooke and the content of [Cuadra's] meetings with police to 'clarify' her

---

[236] App. to Answering Br. at B179.
[237] *Id.* at B465.

identification."[238]  The Superior Court found that Cooke's counsel's decision not to investigate further was objectively reasonable because any information that could have been uncovered through further investigation into Cuadra's misidentification of another individual in the photo lineup was available upon review of Cuadra's 2007 testimony.

We agree that this claim is meritless.  It was reasonable for Cooke's counsel to expect that Cuadra's testimony would be substantially the same in both trials.  And nothing in the record suggests that Cooke's second-trial counsel had reason to believe that Cuadra's testimony would change substantively before the second trial. Additionally, Cooke's contention that an investigation was warranted because second-trial counsel knew that police met with Cuadra "2–3 times to 'clarify' her identification[,]" thus improperly influencing her to later identify Cooke as the individual in the JP Morgan surveillance footage, is unsupported by the record. Detective Rubin's investigative narrative and report states that Rubin spoke with Cuadra "2–3 times" to "clarify aspects of her incident that came up during the course of the investigation, including to clarify her suspect description and ask specifics on minor portions of the crime."[239]  This statement, in our view, does not suggest any

---

[238] Opening Br. at 48.
[239] App. to Opening Br. at A950.

91

impropriety that would make a decision by Cooke's counsel to forgo further investigation objectively unreasonable.

Cooke also fails to show prejudice. Cooke makes no effort to explain how further investigation would have uncovered evidence that Cuadra was improperly influenced by police to identify the man in the JP Morgan ATM video as the man who was in her room. More importantly, though, Cooke's counsel took advantage of Cuadra's testimony concerning her misidentification at the photo lineup to the benefit of his defense. Counsel thoroughly cross-examined Cuadra on her statement that police told her she was "incorrect" and were able to prevent her from making an in-court identification of Cooke. Even without further investigation, by reviewing her 2007 testimony, Cooke's counsel were well prepared to respond to Cuadra's statements at the 2012 trial.

Cooke's final "duty to investigate" claims concern a purported failure of Cooke's counsel to conduct a reasonable investigation into possible alternative perpetrators before arguing that the murder could have been carried out by a member of a fraternity at the University of Pennsylvania. In a similar vein, Cooke argues that counsel was ineffective by deciding to argue that the police investigation into other perpetrators was flawed without conducting a reasonable investigation of

92

police activity during the case. The Superior Court found that these claims were mere "speculation" and denied both.[240] We agree with the Superior Court.

*Strickland* does not require that counsel pursue every line of investigation no matter how unlikely to uncover helpful evidence it would be.[241] The duty to investigate requires only that investigatory decisions be reasonable. It "does not require that a criminal defense attorney leave no stone unturned and no witness unpursued."[242] This is because "[d]efense lawyers have 'limited' time and resources, and so [they] must choose among 'countless' strategic options."[243] Despite Cooke's allegations, his second-trial counsel were under no obligation to exhaust every single line of investigation before presenting the possibility of an alternative perpetrator and a flawed police investigation to the jury.

To support Cooke's desired innocence defense, his counsel sought to cast a reasonable doubt on the State's case by highlighting areas in which the police investigation was incomplete and the possibility that alternative perpetrators had not been investigated. To this end, at trial, Cooke's counsel argued that the presence of a yellow rose in Bonistall's apartment as well as a defaced University of

---

[240] *Cooke*, 2022 WL 17817903, at *68, 71–75.
[241] *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).
[242] *Berryman*, 100 F.3d at 1101.
[243] *Dunn v. Reeves*, 599 U.S. 731, 739 (2021) (quoting *Harrington*, 562 U.S. at 106–07).

Pennsylvania fraternity composite suggested that one of Bonistall's acquaintances at this fraternity was the actual perpetrator.

But Cooke's counsel's investigation into likely alternative perpetrators turned up little admissible evidence and eliminated some individuals as suspects altogether. Cooke asks us to find that his counsel's performance was deficient because the scope of their investigation failed to include "a group of traveling magazine sellers," "two men [who] discovered 'burglary tools' in their car," "probationers [and] parolees" in the area, and unidentified "others."[244] Nothing in the record indicates that Cooke's counsel had any information that made an investigation into any of these individuals necessary. A bald assertion that counsel could have conducted a more granular investigation cannot overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[245] The theory that there may have been alternative perpetrators was a singular component of Cooke's defense. Given the slim chance that any additional evidence would turn up, if it even existed, it was not objectively unreasonable for Cooke's counsel to proceed with their alternative perpetrator theory with the rose and fraternity composite alone.

Having found little evidence to support the theory that there was an alternative perpetrator, Cooke's counsel homed in on the police investigation and were able to

---

[244] Opening Br. at 50.
[245] *Thompson v. State*, 296 A.3d 872, 878 (Del. 2023) (quoting *Strickland*, 466 U.S. at 689).

find leads that had gone unpursued by police, which provided ammunition for cross-examination. Cooke claims that his counsel's actions were objectively unreasonable because they argued that the police investigation was flawed without evidentiary support. But second-trial counsel asked Rubin on multiple occasions about the scope of his investigation.[246] Cooke's conclusion is contradicted by the record. His counsel were not objectively unreasonable.

Even if Cooke could show that counsel failed to conduct a reasonable investigation into alternative perpetrators, Cooke's claim still fails under *Strickland's* prejudice prong. Without support or explanation of what evidence could have been uncovered, Cooke claims that a reasonable investigation of alternative perpetrators and the police investigation would have uncovered evidence pointing to "Warren, Jervey or any other of the half-dozen or more possible perpetrators."[247] This is not "a comprehensive showing as to what [either] investigation would have produced."[248] Indeed, Cooke's expert in the Rule 61 proceeding, Robert Tressel, concluded only that the Newark Police Department should have been more careful in documenting when suspects were no longer being pursued. His report and testimony do not show that an investigation into any suspect would have yielded admissible evidence showing that the police investigation was

---

[246] *See, e.g.*, App. to Answering Br. at B615–17, B634.
[247] Opening Br. at 55.
[248] *Askew*, 88 F.3d at 1073.

flawed. If additional investigation would not have yielded any usable information to support an innocence defense, Cooke cannot show that he was prejudiced.

3

As a final note, Cooke's contention that these claims should be viewed as a whole, rather than as "separate and independent claims[,]"[249] cannot overcome the reality that he has failed to meet his burden under *Strickland* to show that any of his second-trial counsel's investigatory decisions were objectively unreasonable. To "reconstruct the circumstances of counsel's challenged conduct[,]"[250] we must evaluate each of defense counsel's decisions in light of defense counsel's earlier, reasonable choices, as well as the instructions provided by Cooke—their client. Viewed as a whole, Cooke's counsel's decisions were intended to promote an innocence defense in keeping with Cooke's planned testimony and were, in our view, reasonable.

And Cooke's claim that analyzing "the totality of the evidence" to evaluate prejudice would have "removed every material fact" from the State's case collapses under the slightest scrutiny. As we have discussed, an investigation of the State's DNA evidence would not have rendered it "[unreliable] potentially to the point of

---

[249] Opening Br. at 43.
[250] *Strickland*, 466 U.S. at 689.

96

inadmissibility."[251]  And even if, somehow, counsel could have excluded this evidence—obviating the need for an "innocent explanation"—there is nothing in the record to suggest that Cooke would have changed his decision to testify in his own defense.

After successfully arguing before this Court that his first-trial counsel were ineffective because they disregarded his constitutional right to testify in his own defense, the dissonance in Cooke's attempt to argue now that his counsel were ineffective *because* they abided by his decision to testify in his own defense is alarming.  The argument is meritless, and we find that Cooke has failed to carry his burden under *Strickland* and its progeny.

C

Cooke next claims that his second-trial counsel were ineffective because, upon resuming their representation on the third day of trial, they failed to object to six of the State's seven peremptory strikes exercised during jury selection—even though Cooke was pro se throughout the entirety of the jury selection process.  He also claims that his appellate counsel were ineffective for failing to raise these claims on direct appeal.  Cooke alleges that, had his counsel raised these claims, it is reasonably likely that the Superior Court would have found that the State's

---

[251] Opening Br. at 52.

peremptory challenges were based on the prospective juror's race or gender, and that they violated his rights under the United States Constitution as expressed in *Batson v. Kentucky*[252] and *J.E.B. v. Alabama*.[253]

The Superior Court found that five of the six *Batson* claims were procedurally barred by Rule 61(i)(3).[254] The Superior Court reasoned that because Cooke could have raised a *Batson* claim during jury selection, but did not, those claims are now barred. Cooke did challenge the State's peremptory strike of Tysha Sheppard—an African American female. The trial court denied Cooke's challenge, finding that the State had provided race and gender-neutral reasons for the strike: Sheppard had expressed opposition to the death penalty on religious grounds and stated that she would not be swayed by the opinions of other jurors. Because Cooke's *Batson* argument as to this juror was heard during jury selection, the Rule 61 judge found that it was procedurally barred as formerly adjudicated under Rule 61(i)(4). Cooke now seeks to skirt the relevant procedural bars by couching his argument as an ineffective-assistance-of-counsel claim: He contends that "[his] counsel were ineffective for not objecting to (and appellate counsel for not appealing) the State's

---

[252] 476 U.S. 79, 84 (1986).
[253] 511 U.S. 127 (1994).
[254] *Cooke*, 2022 WL 17817903, at *36.

peremptory race- and gender-based strikes."[255]  For efficiency's sake, we address Cooke's argument as he now frames it.

Cooke cites no case from this state—nor could we find one—to support his assertion that his attorneys could have properly raised a *Batson* argument after the jury had been sworn and the evidentiary portion of his second trial had started. Although the United States Supreme Court in *Batson* declined to provide procedural rules to determine when objections during jury selection must be made, it did state that objections to a prosecutor's peremptory challenge must be "timely."[256]  In later applications of *Batson* and its progeny, the Court has recognized that "local practices . . . indicate the proper deadlines in the contexts of the various procedures used to try criminal cases."[257]  "Undoubtedly, then, a state court may adopt a general rule that a *Batson* claim is untimely if it raised for the first time . . . after the jury is sworn."[258]

Cooke makes no mention of our statutory guidance and settled practice on this point.  In *Riley v. State*, we held that "[i]f at some time during *voir dire* the defendant reasonably believes the [s]tate is using peremptory challenges in a racially discriminatory fashion, he must raise the issue in a specific and timely manner."[259]

---

[255] Opening Br. at 57.
[256] *Batson*, 476 U.S. at 99–100.
[257] *Ford v. Georgia*, 498 U.S. 411, 423 (1991).
[258] *Id.*
[259] *Riley v. State*, 496 A.2d 997, 1013 (Del. 1985).

Race or gender-motivated peremptory challenges by the state strip a venire of members of a cognizable group, violating a defendant's right to a random draw of jurors from the entire venire.[260] This principle, and the procedure for protecting a defendant's right to the random selection of jurors free from racial or gender discrimination, is codified in 10 *Del. C.* §§ 4501 *et seq.*

10 *Del. C.* § 4512 "afford[s] [defendants] the opportunity to raise objections to any aspect of the jury selection process."[261] Under Section 4512, a defendant must raise an objection "[w]ithin 7 days after the [defendant] discovers, or by the exercise of diligence could have discovered, the grounds therefor, and in any event before the jury is sworn to try the case."[262] The Superior Court's Rules of Criminal Procedure also provide that any challenge to the array of jurors shall be made "in the manner prescribed in 10 *Del. C.* § 4512."[263] Moreover, under 10 *Del. C.* § 4512(c), "[t]he procedures prescribed by this section are the exclusive means by which a jury may be challenged on the ground that the jury was not selected in conformity with this chapter."[264]

*Batson* and *J.E.B.* claims fall squarely within the ambit of 10 *Del. C.* § 4512. This statute, in effect long before Cooke's second trial, constrained his second-trial

---

[260] *Id.*
[261] *Gattis v. State*, 637 A.2d 808, 812 (Del. 1994).
[262] 10 *Del. C.* § 4512(a).
[263] Del. Super. Ct. Crim. R. 24(d).
[264] 10 *Del. C.* § 4512(c).

counsel's ability to challenge the State's peremptory strikes after the jury had been sworn. The first opportunity Cooke's counsel had to make an objection was on the third day of trial, long after the Section 4512 deadline had passed. Because second-trial counsel were procedurally prohibited from challenging the composition of the jury after the jury had been sworn, a failure to attempt to do so is not objectively unreasonable. It follows that it was not objectively unreasonable for Cooke's appellate counsel not to raise on appeal claims that were procedurally prohibited at trial.

Cooke's ineffective-assistance-of-appellate-counsel claim also fails because any attempt to appeal the trial court's overruling of his objection to the State's peremptory strike of Tysha Sheppard would have been futile. As described above, the State explained during jury selection that Sheppard opposed the death penalty for religious reasons and would not be influenced by the opinions of other jurors. As the State explained to the trial judge, this combination would be "a nightmare scenario because that's where hung juries come from."[265] The trial judge properly permitted the State's peremptory strike, and Cooke's appellate counsel properly recognized that a challenge to the jury selection process was not among the issues on appeal that were likely to be meritorious.[266] Correctly identifying and choosing

---

[265] Trial Tr. 83, Feb. 27, 2012.
[266] App. to Answering Br. at B667–68.

not to pursue meritless appellate arguments was an objectively reasonable action for appellate counsel to take. Accordingly, Cooke's challenge to this peremptory strike, to the extent that it hinges on the alleged ineffectiveness of his appellate counsel, fails. And that is so whether his claim is reviewed as an ineffective-assistance-of-counsel claim or a "freestanding" *Batson* claim.

### D

Cooke's next challenge to the effectiveness of his second-trial counsel focuses on his June 7, 2005 statement to the investigating police officers. In his amended motion in the Superior Court, Cooke alleged that he "lacked the capacity to waive his rights to counsel and to silence."[267] He alleged further that his second-trial counsel were ineffective for failing to challenge the admission of the statement. Viewing the first part of this argument as a corollary to Cooke's competency argument, the Superior Court rejected it by relying on its determination that Cooke was competent. The court rejected the ineffective-assistance component of this claim, noting that counsel did indeed move to suppress the statement but that Cooke had disavowed the motion when he took over the representation.

Because Cooke did not raise his lack of capacity to waive his *Miranda* rights in the proceedings leading to his convictions, it is procedurally barred unless he can

---

[267] App. to Opening Br. at A702.

show cause and prejudice. On the other hand, his ineffective-assistance claim is not barred. And if his counsel were ineffective for not raising the issue at trial, the door might be open for a cause-and-prejudice showing by Cooke. Either way, Cooke must persuade us that his counsel were ineffective if this claim is to gain purchase. He has not done so.

Cooke's assertion that his counsel were ineffective for failing to challenge the admission of his statement is puzzling given that they did just that. In October 2011, four months before Cooke's second trial was scheduled to begin, his counsel filed a motion to suppress Cooke's June 2005 statement.[268] The thrust of the motion was that Cooke did not effectively waive his right to counsel, and, in fact, invoked it. But Cooke disavowed the motion as evidenced by the previously quoted exchange with the trial judge:

> THE COURT: . . . So, right now, I have a decision by you not to go forward on that motion.
> COOKE: Right, because the motion wasn't in my behalf.[269]

Confronted with this inconvenient fact, Cooke argues that it was incumbent upon counsel "to re-file [the motion] upon resuming [their] representation"[270] after Cooke's trial had begun. This ignores yet another inconvenient fact: by the time

---

[268] *Id.* at A304–15.
[269] App. to Answering Br. at B368. Cooke concedes in his opening brief that he disavowed the pretrial motions his second-trial counsel had filed. Opening Br. at 6.
[270] Opening Br. at 61.

103

Cooke's lawyers resumed their role as Cooke's trial counsel, the jury had already heard—during the State's opening statement and without objection—the relevant portions of Cooke's statement. Cooke does not explain, and we do not see, how a renewal of the suppression motion Cooke had voluntarily scrapped would be a practical course of action for Cooke's reinstated counsel to take. Nothing short of the trial court's declaration of a mistrial, it seems to us, would have sufficed. And the likelihood that the trial court would have favorably entertained such an outcome given the history of Cooke's case and his antics throughout was slim to non-existent. In sum, Cooke's contention that it was objectively unreasonable for his second-trial counsel not to renew the motion to suppress after the trial had begun and the jury had heard the relevant portions of the statement is untenable. Accordingly, this claim, like the others, fails.

E

Cooke next argues that the court's denial of his continuance requests after he was granted leave to represent himself violated his due process rights and requires reversal. The Superior Court ruled that this claim was formerly adjudicated in Cooke's direct appeal in 2014 and thus procedurally barred under Superior Court Rule 61(i)(4). Cooke contends, however, that this claim is different than the continuance argument he made in his direct appeal as it is based on evidence of his cognitive impairment that was withheld from the court because of his lawyers'

ineffectiveness. By differentiating his present claim from the one we decided in 2014, Cooke seeks to avoid Rule 61(i)(4) "formerly adjudicated" bar. Instead, according to Cooke, we should review this claim under Rule 61(i)(3), which excuses a procedural default if the movant can show cause and prejudice. Cooke contends further that it was his second-trial counsel's ineffective assistance—that is their "deficient failure to raise and present evidence of Cooke's cognitive and mental health issues"[271]—that led to Cooke seeking *pro se* status and the continuance being denied. This deficiency, Cooke argues, resulted in prejudice sufficient to excuse his procedural default.

Cooke's argument appears to conflate "cause" and "prejudice." It ignores, moreover, that Cooke's counsel advised Cooke that he should not represent himself and advised the court that, should Cooke press his request to represent himself, "the issue of mental competence may need to be addressed by a medical expert."[272] This statement and the Superior Court's competency determination, which we have concluded is supported by sufficient evidence, undermine the factual premise of Cooke's argument.

More to the point, we are satisfied that our 2014 opinion in Cooke's direct appeal adjudicated Cooke's claim that his rights were violated when the Superior

---

[271] Reply Br. at 29.
[272] App. to Answering Br. at B347.

Court denied his continuance request.[273] Then, as now, Cooke relied on the due process clauses of the United States and Delaware constitutions in support of his claim of error. Cooke's subtle recasting of his argument is insufficient to avoid Rule 61(i)(4)'s bar of formerly adjudicated claims. As we have repeatedly observed, "a defendant is not entitled to have a court re-examine an issue that has been previously resolved simply because the claim is refined or restated."[274]

F

Next, Cooke claims that second-trial counsel's alleged errors cumulatively resulted in an unfair trial and that the Superior Court's finding to the contrary is "contradicted by both the record and the law."[275] "Cumulative error must derive from multiple errors that caused 'actual prejudice'" to the defendant at trial.[276] We weigh the cumulative effect of the errors to determine if, combined, they are "prejudicial to substantial rights [so] as to jeopardize the fairness and integrity of the trial process."[277] For the reasons set forth above, we have rejected each of Cooke's claims that second-trial counsel were ineffective; he has therefore failed to allege

---

[273] *See Cooke v. State*, 97 A.3d 513, 528–29 (Del. 2014).
[274] *Bradley v. State*, 135 A.3d 478, 762 (Del. 2016) (quoting *Skinner v. State*, 607 A.2d 1170, 1172 (Del. 1992)). *See also Sykes v. State,* 147 A.3d 201, 216 (Del. 2015) (quoting *Skinner*, 607 A.2d at 1172).
[275] Opening Br. at 67.
[276] *Swan v. State*, 248 A.3d 839, 869 (Del. 2021) (quoting *Michaels v. State*, 970 A.2d 223, 231–32 (Del. 2009)).
[277] *Hoskins v. State*, 102 A.3d 724, 735 (Del. 2014).

any errors. Because all of Cooke's claims of error are meritless, his claim of cumulative error fails.[278]

G

In his penultimate argument, Cooke contends that the Superior Court erred in its denial of discovery in the Rule 61 proceedings. In his opening brief, however, Cooke neither directs our attention to a specific discovery request nor identifies with any particularity the material or evidence to which he was prejudicially denied access. Instead, he seems to argue that unless he is granted unfettered access to the prosecution's and the Newark Police Department's files, he will be unable to determine whether the State complied with its obligation to disclose exculpatory information under *Brady v. Maryland*[279] and its progeny.

The decision of the Superior Court to refuse additional discovery in a Rule 61 proceeding is reviewed for abuse of discretion.[280] Considering the amount of discovery Cooke enjoyed as he and his numerous counsel prepared for his two trials and his vague assertion that he is entitled to more now, we are not prepared to find that the Superior Court's denial of Rule 61 amounted to an abuse of discretion.

---

[278] *See Johnson v. State*, 129 A.3d 882, 2015 WL 8528889, at *3 (Del. 2015) (TABLE).
[279] 373 U.S. 83 (1963).
[280] *Dawson v. State*, 673 A.2d 1186, 1197 (Del. 1996).

# H

Finally, Cooke complains that our extension of the word-limit he was to observe in his opening brief[281] prevented him from including all the claims raised in his Rule 61 motion in the body of his opening brief. Consequently, to preserve his federal habeas rights, Cooke asserts numerous additional appellate arguments but offers no argument in their favor, relying instead on the arguments he made in the Superior Court.

In keeping with our opinion in *Ploof v. State*,[282] we conclude that Supreme Court Rule 14's requirement that Cooke raise the merits of his argument within the body of his opening brief was not satisfied by combining a conclusory statement of claims with a reference to his filings in the Superior Court.[283] Cooke has waived the issues he has attempted to raise in that fashion.

---

[281] Under Supreme Court rule 14(d), an opening brief shall not exceed 10,000 words. By motion, Cooke requested that we expand this limitation to 26,000 words. By order dated April 28, 2023, we expanded the limitation to 15,000 words.

[282] 75 A.3d at 8822–23.

[283] Those issues are that (1) the State falsified, suppressed and destroyed material evidence in order to convict Cooke; (2) Cooke was deprived of a fair and reliable trial where members of the jury were exposed to adverse community sentiment and prejudicial pretrial publicity; (3) the court's dependence on the evidentiary rulings of the first trial denied Cooke due process; (4) counsel were ineffective for failing to seek the exclusion of the State's footprint comparison evidence; (5) as a result of the judicial misconduct that infected the first trial, Cooke's second trial violated double jeopardy; (6) the trial court's reasonable doubt instruction was improper; and (7) the prosecutor's engaged in misconduct during the guilt-innocence and penalty phases of Cooke's trial. Opening Br. at 72.

## IV

Superior Court Criminal Rule 61 serves an important function in our criminal-justice system. The availability of postconviction relief under the rule provides a procedurally circumscribed safeguard against convictions that are, despite the customary procedural protections observed in serious criminal cases, tainted by unfairness or injustice. Our review of the record here convinces us that this does not come close to being such a case.

Cooke may pursue—indeed, he has stated his intent to seek, if necessary—relief from his convictions in federal court. The legitimacy of that course of action is beyond our purview. We can, however, close the book on this two-decades long saga in the courts of our State that began with Cooke's 2005 crime spree and his senseless rape and murder of Lindsey Bonistall; we do so now by affirming the Superior Court's denial of Cooke's amended motion for postconviction relief.